Nicole L. Greenblatt, P.C.
Susan D. Golden
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Whitney Fogelberg (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| LAKELAND TOURS, LLC, *et al.*,[1] | ) | Case No. 20-11647 (JLG) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DEBTORS' MOTION**
**SEEKING ENTRY OF INTERIM AND**
**FINAL ORDERS (I) AUTHORIZING THE DEBTORS (A) TO**
**OBTAIN POSTPETITION FINANCING AND (B) TO UTILIZE**
**CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO**
**PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY,**
**(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion (this "Motion"):[2]

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Lakeland Tours, LLC (2946); Brightspark Travel, Inc. (4913); Explorica Merida Holdings, LLC (6915); Explorica Travel, Inc. (4040); Explorica, Inc. (3247); GlobaLinks - Canada, LLC (0811); GlobaLinks, LLC (6865); Heritage Education & Festivals, LLC (6352); International Studies Abroad, LLC (4025); ISA World Holding, LLC (5258); Lakeland Finance, LLC (9273); Lakeland Holdings, LLC (2612); Lakeland Seller Finance, LLC (0866); Leadership Platform Acquisition Corporation (4276); National Educational Travel Council, LLC (5704); Oxbridge Academic Resources, LLC (6010); Travel Turf, Inc. (0766); WH Blocker, Inc. (5344); WorldStrides Holdings, LLC (5007); WorldStrides International, LLC (6303); WS Holdings Acquisition, Inc. (9485); WS Holdings, Inc. (0057); WS Purchaser, Inc. (0370).  The location of the Debtors' service address in these chapter 11 cases is: 49 West 45th Street, New York, NY 10036.

[2]    A detailed description of the Debtors and their business, and the facts and circumstances supporting this Motion are set forth in the *Declaration of Kellie Goldstein,* Chief Financial Officer of Lakeland Tours, LLC d/b/a WorldStrides, *(I) in Support of Chapter 11 Petitions and First Day Pleadings and (II) Pursuant to Local Rule 1007-2* (the "First Day Declaration"), filed contemporaneously with the commencement of these chapter 11 cases

**Preliminary Statement**

1.      The Debtors' liquidity has deteriorated over the last several months due to the worldwide shutdown of travel as a result of the COVID-19 pandemic.  Consequently, the Debtors are in urgent need of liquidity to continue operating their business in the ordinary course during these chapter 11 cases (the "<u>Cases</u>"), and to secure exit financing to ensure necessary liquidity upon emergence from bankruptcy.  To fund the Debtors' operations during the Cases and execute the restructuring contemplated by the Debtors' RSA (as defined below), the Debtors urgently require debtor-in-possession financing (the "<u>DIP Facility</u>") in the form of continued access to cash collateral (as defined in section 363(a) of the Bankruptcy Code) ("<u>Cash Collateral</u>") and additional new money financing provided by certain of the Debtors' prepetition lenders and sponsors.

2.      The Debtors seek approval of the proposed approximately $351.8 million DIP Facility and to secure the Credit Agreement Hedging Obligations (as defined in the RSA) on a postpetition basis.  Significantly, the proposed DIP Facility is comprised of (i) $100 million of new money provided by the DIP Lenders (the "<u>Lender DIP Loans</u>"), (ii) $100 million of new money provided by the Sponsors (the "<u>Sponsor DIP Loans</u>"), (iii) a roll up of $150 million in outstanding Prepetition Loans (the "<u>DIP Roll Up Loans</u>"), and (iv) the roll-over of up to approximately $1.8 million of Existing Letters of Credit.  Access to the proposed DIP Facility will send a clear signal to the market that the Debtors' operations can and will continue on a business-as-usual basis.   Further, the coupling of the DIP Loans (defined below) with the exit financing agreed to in the RSA provides assurance that the Debtors will have the liquidity necessary to emerge as a stronger, appropriately-capitalized company.

---

and incorporated by reference herein.  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the First Day Declaration, the Spencer Declaration, the DIP Credit Agreement, or the Interim Order (as defined below), as applicable.

3.     No third-party has come forward with a more favorable proposal for a facility on a junior or unsecured basis to meet the Debtors' liquidity needs and support consummation of a consensual prepackaged plan.  Although there was interest by third parties to provide financing, ultimately none of these investors expressed interest in providing a competing DIP financing proposal to the Debtors on more favorable economic terms than the proposed DIP Facility.  In fact, as set forth in the Spencer Declaration, no third party provided an executable postpetition financing facility that would both facilitate the expeditious recapitalization outlined in the Debtors' RSA and simultaneously secure the stakeholder support required to confirm the proposed chapter 11 plan of reorganization (the "Plan").

4.     Further, the Debtors do not believe they can adequately protect, preserve, and maximize the value of their estates without access to postpetition financing.  Given the Debtors' circumstances, the terms of the proposed DIP Facility are fair, reasonable, adequate, and necessary to preserve and maximize the value of the Debtors' business, and thus is unquestionably in the best interests of the Debtors, their estate, and their creditors.  The proposed DIP Facility, together with the RSA and the Debtors' proposed prepackaged Plan, provide the Debtors with a path to an expeditious exit from chapter 11.  If approved, the Debtors will use the liquidity provided by the DIP Facility and their continued access to Cash Collateral to, among other things, pay critical obligations such as customer refunds, employee wages and benefits, and liabilities for goods and services from vendors, including but not limited to, supplying travels arrangements, lodging, meals, and educational programs, as well as fund the administration of the Cases.

**Jurisdiction and Venue**

5.     The United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the*

*Southern District of New York*, dated January 31, 2012.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Bankruptcy Court in connection with this Motion to the extent that it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.       Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.       The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014, and Bankruptcy Rules 2002-1, 4001-2, 9006-1, 9013-1, and 9014-1, and rule 9014-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules").

## Background

8.       The above-captioned Debtors, together with their non-Debtor affiliates, provide full-service educational travel and experiential learning programs domestically and internationally for students from K12 to graduate level.  The Debtors are the largest accredited travel company in the United States, providing organized educational travel and other experiential learning programs for more than 550,000 students in 2019.  The Debtors generated approximately $650 million in net revenue in fiscal year 2019, and employ approximately 1,500 people domestically and internationally.  The Debtors have historically enjoyed a stable position as the preeminent provider of educational travel.  However, the Debtors' businesses have sustained significant losses as a result of the worldwide shutdown of travel due to the COVID-19 pandemic, with additional constraints to liquidity anticipated in August and September 2020 as the Debtors continue to

provide customer refunds.    As of July 20, 2020, (the "Petition Date"), the Debtors have approximately $768 million in funded debt obligations.

9.    Prior to the Petition Date, the Debtors entered into a restructuring support agreement (the "RSA") with their key stakeholders, including approximately 82.6% of the holders of the Debtors' senior secured credit facility (such facility, the "Prepetition Credit Agreement" and such holders, the "Consenting Lenders"), J. Aron & Company (the "Consenting Hedge Provider"), and Eurazeo North America and Primavera Capital Management Ltd. (the "Sponsors"), and launched solicitation of the Plan.  The Debtors have commenced the Cases to effectuate the transactions contemplated in the RSA and the Plan to restructure their funded debt, while ensuring that the financial restructuring will have a minimal impact on the Debtors' operations, their key business partners, and their customers.

10.    On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of the Cases pursuant to Bankruptcy Rule 1015(b).

## **Relief Requested**

11.    The Debtors seek entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim Order"), and a final order (the "Final Order,"[3] and collectively with the Interim Order, the "DIP Orders"):   (a) authorizing the Debtors to incur the senior secured superpriority debtor-in-possession DIP Facility; (b) authorizing the Debtors to use Cash Collateral;

---

[3]    The Debtors will file a proposed form of the Final Order prior to the Final Hearing (as defined herein).

(c) granting liens and providing superpriority administrative expense status to the DIP Facility;
(d) granting adequate protection, solely to the extent provided in the DIP Orders, to the Prepetition
Secured Parties; (e) modifying the automatic stay imposed by section 362 of the Bankruptcy Code
to the extent necessary to implement and effectuate the terms of the DIP Orders; (f) scheduling a
final hearing (the "Final Hearing") to consider approval of this Motion on a final basis; and
(g) granting related relief.  The Prepetition Secured Parties are consenting to the use of Cash
Collateral under the terms and conditions of the Interim Order.

12.     In support of this Motion, the Debtors respectfully submit the declaration of
Stephen Spencer (the "Spencer Declaration"), a copy of which is attached hereto as **Exhibit B**,
and the First Day Declaration.

**Interim Relief is Necessary**

13.     The Debtors will not be able to meet ordinary course obligations without access to
Cash Collateral and the DIP Facility during the interim period following the Petition Date, which
is needed to pay wages and benefits, customer refunds, taxes and fees, rent, invoices for goods and
services, and other obligations that will come due during the interim period.  Otherwise, the
Debtors risk disrupting their business materially and jeopardizing their existing relationships with
employees, government entities, contract counterparties, business partners, and customers, among
others.  These constituents are critically important to the Debtors' go-forward business and the
realization of recoveries under the Plan.  Therefore, authority to use Cash Collateral during the
interim period and obtain the DIP Facility is necessary to ensure that the Debtors do not harm their
businesses while pursuing a value maximizing restructuring transaction during the course of these
short Cases.

**Concise Statement Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-2[4]**

14.     By this Motion, the Debtors seek entry of the Interim Order and Final Order:

a.      authorizing the Debtors to (a) obtain superpriority senior secured postpetition financing in the form of the DIP Facility, including a superpriority senior secured term loan credit facility in the aggregate amount of up to approximately $351.8 million (the "DIP Loans") that are funded into escrow within three (3) business days of the date of the entry of the Interim Order (which DIP Loans are comprised of (i) the Lender DIP Loans, (ii) the Sponsor DIP Loans, (iii) the DIP Roll Up Loans, and (iv) the roll-over of up to approximately $1.8 million of Existing Letters of Credit), including (x) an initial withdrawal in the aggregate principal amount of up to $150 million available within one (1) day after funding into escrow and (y) subsequent withdrawals in an amount such that any such withdrawal shall not exceed the amount that, when taken together with the Actual Liquidity (as defined in the DIP Credit Agreement) on the date of withdrawal, is equal to $150 million; and (b) secure the Credit Agreement Hedging Obligations (as defined in the RSA) on a postpetition basis, pursuant to the DIP Credit Agreement, substantially in the form attached hereto as **Exhibit 2** to **Exhibit A**;

b.      authorizing the Debtors to execute and deliver the DIP Credit Agreement and any other agreements, instruments, pledge agreements, guarantees, control agreements, and other documents related thereto (as amended, restated, supplemented, waived, and/or modified from time to time, collectively, with the DIP Credit Agreement and the DIP Orders, the "DIP Documents") and to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate, or desirable in connection with the DIP Documents;

c.      granting the DIP Facility and all obligations owing thereunder and under, or secured by the DIP Documents to the DIP Agent, the DIP Lenders and the Sponsors (collectively, and including all Obligations as described in the DIP Credit Agreement, the "DIP Obligations") allowed superpriority administrative expense claims status in each of the Cases and any Successor Cases, subject to the U.S. Trustee Carve Out and the Carve Out (as applicable);

d.      granting to the DIP Agent, for the benefit of itself, the DIP Lenders and the Sponsors under the applicable DIP Documents, automatically perfected

---

[4]     The summary of the Interim Order and the terms and conditions for the DIP Facility and use of Cash Collateral set forth in this Motion is qualified are its entirety by the Interim Order. In the event that there is any conflict between this Motion and the Interim Order, the Interim Order will control in all respects. Capitalized terms used but not otherwise defined in this summary shall have the respective meanings ascribed to them in the Interim Order.

security interests in and liens on all of the DIP Collateral (as defined in the DIP Credit Agreement), including all property constituting Cash Collateral, which liens shall be subject to the priorities set forth in the Interim Order and Final Order (as applicable) and DIP Documents, and shall be subject to the U.S. Trustee Carve Out and the Carve Out (as applicable);

e.   authorizing the Debtors to use any Cash Collateral in which the Prepetition Secured Parties (as defined herein) have an interest, and proceeds of the DIP Facility, in each case in accordance with the Interim Order and the DIP Documents, including in accordance with the Budget (subject to Permitted Variances, unless otherwise expressly specified in the DIP Credit Agreement);

f.   authorizing the Debtors to pay the upfront fees, closing fees, administration fees, and commitment fees payable on the Closing Date (as defined herein), and the reasonable and documented fees and disbursements of the DIP Secured Parties' attorneys, advisors, accountants, and other consultants, all to the extent provided in, and in accordance with, the DIP Documents;

g.   authorizing the Debtors to use the Prepetition Collateral (as defined in the Interim Order), including the Cash Collateral, of the Prepetition Secured Parties (as defined herein) under the Prepetition Credit Agreement (as defined herein), and providing adequate protection to the DIP Secured Parties and Prepetition Secured Parties to the extent of any diminution in value of their respective interests in Prepetition Collateral, including the Cash Collateral, resulting from the imposition of the automatic stay, the Debtors' use, sale, or lease of Prepetition Collateral, including Cash Collateral, and/or the priming of their respective interests in Prepetition Collateral, including the Cash Collateral (subject to the Carve Out (as defined in the Interim Order));

h.   vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Interim Order, and waiving any applicable stay (including under Bankruptcy Rule 6004) to provide for the immediate effectiveness of the Interim Order;

i.   scheduling a Final Hearing to consider the relief requested herein and approving the form of notice with respect to the Final Hearing; and

j.   granting related relief.

15.   The below chart contains a summary of the material terms of the proposed DIP Facility and DIP Orders, together with references to the applicable sections of the relevant source

documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule

4001-2.[5]

| Summary of Material Terms | |
|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | Lakeland Tours, LLC.<br><br>*See* DIP Credit Agreement, Intro |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Lakeland Finance, LLC, Heritage Education and Festivals, LLC, Oxbridge Academic Resources, LLC, WorldStrides International, LLC, Explorica Inc., National Educational Travel Council, LLC, International Studies Abroad, LLC, Explorica Travel, Inc., Explorica Merida Holdings, LLC, GlobaLinks - Canada, LLC, GlobaLinks, LLC, ISA World Holding, LLC, Brightspark Travel, Inc., Travel Turf, Inc. and Leadership Platform Acquisition Corporation (the "Guarantors" and, together with the Borrower, the "Loan Parties").<br><br>*See* DIP Credit Agreement, Intro and Article I |
| **DIP Lenders**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Those lenders listed on the Commitment Schedule to the Credit Agreement and any other Person that becomes a Lender thereunder pursuant to the terms thereof.<br><br>*See* DIP Credit Agreement, "Lenders", Section 1.01 |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | The earliest of (a) the date that is six months after the Petition Date, (b) the date on which the Obligations become due and payable pursuant to this Agreement, whether by acceleration or otherwise, (c) the effective date of a Chapter 11 Plan for the Debtors, (d) the date of consummation of a sale of all or substantially all of the Debtors' assets under Section 363 of the Bankruptcy Code, (e) the first business day on which the Interim Order expires by its terms or is terminated, unless the Final Order has been entered and become effective prior thereto, (f) conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or any Loan Party having filed a motion or other pleading seeking the conversion of the Chapter 11 Cases to Chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the Required Lenders and the Sponsors (which consent may be communicated via an email from each of the Specified Lender Advisors and the Sponsor Advisors), (g) dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing by the Required Lenders and the Sponsors (which consent may be communicated via an email from each of the Specified Lender Advisors and the Sponsor Advisors), and (h) the date on which the Final Order is vacated, terminated, rescinded, revoked, declared null and void or otherwise ceases to be in full force and effect (unless consented to by the Required Lenders and the Sponsors) (which consent may be communicated via an email from each of the Specified Lender Advisors and the Sponsor Advisors).<br><br>*See* DIP Credit Agreement, "Maturity Date," Section 1.01 |

---

[5]  Capitalized terms used in the following summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim Order, as applicable.

| Summary of Material Terms | |
|---|---|
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | $351.8 million in the aggregate in the form of a superpriority senior secured term loan credit facility.<br><br>*See* DIP Credit Agreement, "Commitment", Section 1.01 and Section 2.01 |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | The obligation of each DIP Lender and the Sponsors to make DIP Loans, and the Pre-Petition Issuing Banks to agree to the terms related to the Existing Letters of Credit thereunder, is subject to the satisfaction (or waiver) of the following further conditions precedent:<br><br>• <u>Loan Documents</u>. All legal matters incident to the DIP Credit Agreement, the DIP Loans thereunder and the other DIP Documents shall be satisfactory to the Required Lenders and the Sponsors in their respective sole discretion and there shall have been delivered to the DIP Agent, the Specified Lender Advisors and the Sponsor Advisors a properly executed counterpart of the DIP Credit Agreement and each of the other Loan Documents by the applicable parties thereto (which satisfaction may be communicated via an email from each of the Specified Lender Advisors and the Sponsor Advisors, as applicable).<br><br>• <u>Legal Opinion</u>. The DIP Agent shall have received, on behalf of itself, the DIP Lenders, each Pre-Petition Issuing Bank and the Sponsors, a customary written opinion of Kirkland & Ellis LLP, in its capacity as special New York counsel to the Loan Parties.<br><br>• <u>Cash Flow Forecast</u>. The DIP Agent, the DIP Lenders and the Sponsors shall have received a 13-Week Cash Flow Forecast in form and substance satisfactory to the Required Lenders and the Sponsors (which satisfaction may be communicated via an email from each of the Specified Lender Advisors and the Sponsor Advisors, as applicable).<br><br>• <u>Secretary's Certificate; Good Standing Certificates</u>. The DIP Agent shall have received (i) a certificate of each Loan Party, dated the Closing Date and executed by a secretary, assistant secretary or other Responsible Officer thereof, which shall (A) certify that attached thereto are (x) a true and complete copy of the certificate or articles of incorporation, formation or organization of such Loan Party certified by the relevant authority of its jurisdiction of organization, which certificate or articles of incorporation, formation or organization have not been amended (except as attached thereto) since the date reflected thereon, (y) a true and correct copy of the by-laws or operating, management, partnership or similar agreement of such Loan Party, together with all amendments thereto as of the Closing Date, which by-laws or operating, management, partnership or similar agreement are in full force and effect, and (z) a true and complete copy of the resolutions or written consent, as applicable, of its Board of Directors authorizing the execution and delivery of the Loan Documents, which resolutions or consent have not been modified, rescinded or amended (other than as attached thereto) and are in full force and effect, and (B) identify by name and title and bear the signatures of the Responsible Officers of such Loan Party authorized to sign the Loan Documents to which such Loan Party is a party on the Closing Date and (ii) a good standing (or equivalent) certificate for such Loan Party from the relevant authority of its jurisdiction of organization, dated as of a recent date, in each case satisfactory to the Required Lenders and the Sponsors (which |

| | **Summary of Material Terms** |
|---|---|
| | satisfaction may be communicated via an email from each of the Specified Lender Advisors and the Sponsor Advisors, as applicable).<br><br>• <u>Representations and Warranties</u>.  As of the Closing Date, each of the representations and warranties relating to any Loan Party or its Subsidiaries set forth in Article III or in any other Loan Document shall be true and correct in all material respects on and as of the Closing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date); provided that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on and as of the Closing Date.<br><br>• <u>Fees</u>. (i) All fees (including any fees to be paid for the account of any Lender on the Closing Date that Borrower has previously agreed to in writing (including in the Fee Letters)) and other amounts due and payable on or before the Closing Date, including, to the extent invoiced not less than one Business Day prior to the Closing Date, reimbursement or payment of all out-of-pocket expenses (including the premiums and fees and the legal fees and expenses of the Specified Lender Advisors, as counsel to the Ad Hoc Group of Consenting Lenders, the relevant Agent Advisors, as counsel to the Agents, and the relevant Sponsor Advisors, as counsel to the Sponsors), and the fees and expenses of any local counsel, foreign counsel, appraisers, consultants and other advisors, shall be paid (or will be paid from the proceeds of the Loans), in each case to the extent required to be reimbursed or paid by the Loan Parties hereunder or under any other Loan Document (in each case, which may be paid with the proceeds of the Loans), and (ii) all fees and expenses that Borrower is required to pay to the Pre-Petition Agent pursuant to <u>Section 9.03</u> under the Pre-Petition Credit Agreement, including, to the extent invoiced not less than one Business Day prior to the Closing Date, reimbursement or payment of the legal fees and expenses of Latham & Watkins LLP.<br><br>• <u>Closing Date Certificate</u>.  The DIP Agent shall have received (i) a customary certificate of each such Loan Party (satisfactory to the Required Lenders and the Sponsors (which satisfaction may be communicated via an email from either of the Specified Lender Advisors and the Sponsor Advisors, as applicable)), dated the Closing Date and signed by two Responsible Officers of the Borrower, one of whom shall be a financial officer, confirming compliance with the conditions precedent set forth in <u>Section 4.01(e)</u>, <u>Section 4.01(q)</u>, <u>Section 4.01(r)</u> and <u>Section 4.01(v)</u>.<br><br>• <u>Orders</u>. (i) The Bankruptcy Court shall have entered the Interim Order, no later than three (3) Business Days after the Petition Date, and such order shall be in form and substance satisfactory to the Required Lenders and the Sponsors (which satisfaction may be communicated via an email from each of the Specified Lender Advisors and the Sponsor Advisors, as applicable) (and with respect to any provisions that affect the rights or duties of the DIP Agent, the DIP Agent) in their sole discretion, be in full force and effect, and shall not have been reversed, |

| Summary of Material Terms |
|---|
| modified, amended, stayed or vacated absent prior written consent of the Required Lenders and the Sponsors (which satisfaction may be communicated via an email from each of the Specified Lender Advisors and the Sponsor Advisors, as applicable) (and with respect to any provisions that affect the rights or duties of the DIP Agent, the DIP Agent); (ii) the DIP Agent, the DIP Lenders and the Sponsors shall have received drafts of the "first day" pleadings for the Chapter 11 Cases, in each case, in form and substance reasonably satisfactory to the DIP Agent, the Required Lenders and the Sponsors (which satisfaction may be communicated via an email from each of the Specified Lender Advisors and the Sponsor Advisors, as applicable; (iii) all motions, orders (including the "first day" orders) and other documents to be filed with or submitted to the Bankruptcy Court on the Petition Date shall be in form and substance reasonably satisfactory to the DIP Agent, the DIP Lenders and the Sponsors; and (iv) all "first day" orders shall have been approved and entered by the Bankruptcy Court except as otherwise agreed by the Required Lenders and the Sponsors (which agreement may be communicated via an email from each of the Specified Lender Advisors and the Sponsor Advisors, as applicable).<br><br>• <u>Other Filings.</u> Each of the Chapter 11 Plan, Chapter 11 Disclosure Statement, and the related motions seeking approval of the adequacy of the Chapter 11 Plan Disclosure Statement and the Solicitation Materials and approval of the Prepack Scheduling Order, in each case, in form and substance reasonably acceptable to the Required Lenders, the Sponsors and the Borrower shall have been filed with the Bankruptcy Court.<br><br>• <u>Approved Budget</u>. The DIP Agent, the DIP Lenders and the Sponsors shall have received the Approved Budget.<br><br>• <u>Compliance with RSA</u>. The RSA shall have been duly executed by the parties thereto and be in full force and effect and no default by any of the Loan Parties and no RSA Termination Event, in each case, shall have occurred and be continuing (with all applicable grace periods having expired) under the RSA.<br><br>• <u>Adequate Protection</u>. The Pre-Petition Agent and the Pre-Petition Lenders shall have each consented to the use of collateral or received adequate protection (if applicable) in respect of the liens securing their respective obligations pursuant to the Interim Order.<br><br>• <u>Notice</u>. The DIP Agent shall have received a Borrowing Request as required by <u>Section 2.02(a)</u>.<br><br>• <u>No Default</u>. On the Closing Date and immediately after giving effect to any Loans made on the Closing Date and the application of the proceeds thereof, no Default or Event of Default shall have occurred and be continuing on such date.<br><br>• <u>Material Adverse Effect</u>.  Since the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has or could be reasonably expected to have a Material Adverse Effect.<br><br>• <u>USA PATRIOT Act, Etc</u>. No later than three Business Days in advance of the Closing Date, the DIP Agent, the DIP Lenders and the Sponsors shall have received all documentation and other information required |

| Summary of Material Terms |
|---|
| |

by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, as has been requested in writing by the DIP Agent, any of the DIP Lenders at least five days prior to the Closing Date.

- <u>Beneficial Ownership Certificate</u>.  At least three days in advance of the Closing Date, the Administrative Agent and the Lenders shall have received a Beneficial Ownership Certificate in relation to any Loan Parties to the extent that such Loan Party qualifies as a "legal entity customer".

- <u>Minimum Actual Liquidity</u>.  Actual Liquidity equals or exceeds $20,000,000.

Any Withdrawal on or after the Closing Date is subject to the satisfaction or waiver of the following additional conditions precedent:

- <u>Withdrawal Notice</u>.   The DIP Agent (for distribution to the DIP Lenders, the Sponsors, the Specified Lender Advisors and the Sponsor Advisors) shall have received an executed Withdrawal Notice, executed by the Borrower requesting the proposed Withdrawal thereunder by no later than 2:00 p.m. the day immediately prior to the proposed Withdrawal Date.

- <u>Representations and Warranties</u>.   Each of the representations and warranties made by any Loan Party set forth in Article 3 or in any other Loan Document shall be true and correct in all material respects on and as of the Withdrawal Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date); provided that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

- <u>No Fraud</u>.  After due inquiry, each Loan Party is unaware of any fraudulent activities in connection with its business.

- <u>No Default</u>.  At the time of and immediately after giving effect to the applicable Withdrawal and the application of the proceeds thereof, no Default or Event of Default shall have occurred and be continuing on such date.

- <u>Bankruptcy Proceedings</u>.   (i) The DIP Order, shall not have been vacated, stayed, reversed, modified, or amended, in whole or in any part, without the DIP Agent's, the Required Lenders' and the Sponsors' written consent (which consent with respect to the Required Lenders and the Sponsors may be communicated via an email from each of the Specified Lender Advisors and the Sponsor Advisors, as applicable) and shall otherwise be in full force and effect; (ii) no motion for reconsideration of the Final Order shall have been timely filed by a Debtor or any of their Subsidiaries; and (iii) no appeal of the Final Order shall have been timely filed.

- <u>RSA</u>.  The RSA shall be in full force and effect and no material default by any of the Loan Parties shall have occurred and be continuing (with

| Summary of Material Terms |
|---|

| | all applicable grace periods having expired) under the RSA, except as otherwise waived in accordance with the terms thereof.<br><br>• <u>Fees</u>. Solely with respect to the initial withdrawal following the entry of the Interim Order, all reasonable and documented out-of-pocket fees and expenses required to be paid under the Loan Documents shall have been paid (or will be paid from the proceeds of such Loans).<br><br>• <u>Approved Budget</u>. The Loan Parties shall be in compliance with the Approved Budget in all respects and the proceeds of the Loans shall be used as set forth in the Approved Budget (in each case, subject to the Permitted Variance).<br><br>• <u>Required Milestones</u>. The Borrower shall be in compliance in all respects with the Required Milestones.<br><br>• <u>Maximum Withdrawal Amount</u>. The amount of the applicable Withdrawal shall not exceed the Maximum Withdrawal Amount on the Withdrawal Date.<br><br>*See* DIP Credit Agreement, Sections 4.01–4.02 |
|---|---|
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | The Loans that comprise each ABR Borrowing shall bear interest at the Alternate Base Rate <u>plus</u> the Applicable Rate. Subject to the provisions of <u>Section 2.13(c)</u>, each New Money Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to (x) for each such Adjusted Eurocurrency Rate Loan, the Adjusted Eurocurrency Rate for such Interest Period <u>plus</u> the Applicable Rate for New Money Loans that are Adjusted Eurocurrency Rate Loans and (y) for each such ABR Loan, the Alternate Base Rate <u>plus</u> the Applicable Rate then in effect for New Money Loans that are ABR Loans.<br><br>"<u>Applicable Rate</u>" means, for any day, (a) with respect to any Roll-Up Loans, (x) 11.00% per annum for any ABR Loan and (y) 12.00% per annum for any Adjusted Eurocurrency Rate Loan, which shall be comprised of (i) 1.50% per annum in the case of any ABR Loan and any Adjusted Eurocurrency Rate Loan, in each case, payable in cash and (ii) 9.50% per annum for any ABR Loan and 10.50% per annum in the case of any Adjusted Eurocurrency Rate Loan, payable as PIK Interest, and (b) with respect to any New Money Loans, (x) 11.00% per annum for any ABR Loan and (y) 12.00% per annum for any Adjusted Eurocurrency Rate Loan, in each case, payable in cash.<br><br>*See* DIP Credit Agreement, Section 2.13 |
| **Use of DIP Financing Facility and Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(ii)<br><br>Local Rule 4001-2(a)(ii) | Subject to the terms and conditions herein, the use of cash collateral and the proceeds of the DIP Loans made, and deemed made, hereunder shall be used by the Borrower, solely on or after the Closing Date, in accordance with the DIP Order and the Approved Budget (subject to Permitted Variances): (i) to repay and refinance on the Closing Date on a dollar for dollar basis certain then outstanding Existing Loans with the Roll-Up Loans, (ii) to pay related transaction costs, fees and expenses (including attorney's fees required to be paid hereunder and to fund the Carve-Out) with respect to the DIP Facility, (iii) to make the adequate protection payments (if any) in accordance with the Approved Budget and the DIP Order, and (iv) to provide working capital, and for other general corporate purposes of the Loan Parties and their Subsidiaries, and to pay administration costs of the Chapter 11 Cases and |

| Summary of Material Terms | |
|---|---|
| | claims or amounts approved by the Bankruptcy Court in accordance with the Approved Budget (subject to Permitted Variances). The Loan Parties shall not be permitted to use the proceeds of the Loans or any cash collateral in contravention of the provisions of the Loan Documents, the Approved Budget (subject to Permitted Variances), the DIP Order or any applicable insolvency laws, including any restrictions or limitations on the use of proceeds contained therein. |
| | *See* DIP Credit Agreement, Section 5.11 |
| **Adequate Protection** Bankruptcy Rule 4001(b)(1)(B)(iv) Local Rule 4001-2(a)(i)(B) | The Debtors have agreed to provide the following forms of Adequate Protection to the Prepetition Secured Parties, in each case subject to the Carve Out: |
| | • <u>Adequate Protection Liens</u>. As security for and solely to the extent of any Diminution in Value, additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens as of the date of the Interim Order, without the necessity of the execution by the Debtors (or recordation or other filing), of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, on all DIP Collateral and, if authorized in the Final Order, all proceeds or property recovered from Avoidance Actions. Subject to the terms of the Interim Order, the Adequate Protection Liens shall be subordinate only to the (A) Carve Out, (B) the DIP Liens, and (C) other valid, perfected and unavoidable liens, if any, existing as of the Petition Date that are senior in priority to the Prepetition Liens of the Prepetition Secured Parties as permitted by the terms of the Prepetition Loan Documents. |
| | • <u>Adequate Protection Superpriority Claims</u>. As further adequate protection, and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code, allowed administrative expense claims in each of the Cases ahead of and senior to any and all other administrative expense claims in such Cases to the extent of any postpetition Diminution in Value, but junior to the Carve Out and the DIP Superpriority Claims. |
| | • <u>First Lien Adequate Protection Payments</u>. As further adequate protection, the Debtors are authorized and directed to pay, in accordance with the terms of Paragraph **Error! Reference source not found.** of the Interim Order, (i) all reasonable and documented fees and expenses (the "<u>Adequate Protection Fees</u>"), whether incurred before or after the Petition Date, including all reasonable and documented fees and expenses of counsel and other professionals retained as provided for in the DIP Documents and the Interim Order, including, for the avoidance of doubt, of (A) Latham & Watkins, LLP, as counsel to the DIP Agent and counsel to the Prepetition Administrative Agent and Consenting Hedge Provider, (B) Gibson, Dunn & Crutcher LLP ("<u>Gibson</u>") as counsel to the DIP Lenders and Prepetition Term Loan Lenders, (C) Rothschild & Co., as financial advisor to the DIP Lenders and Prepetition Term Loan Lenders, and (D) solely to the extent necessary to exercise and fulfill its obligations under the Prepetition Loan Documents, one counsel to the Prepetition Administrative Agent in each local jurisdiction, and (ii) non-refundable cash payment of all accrued but unpaid interest under the Prepetition Credit Agreement as |

| Summary of Material Terms |
|---|
| |

| | |
|---|---|
| | such interest becomes due, or, in the event the Plan Effective Date (each as defined in the RSA) occurs before the next scheduled interest payment date, the Plan Effective Date (only with respect to interest accrued through such date) (all payments referenced in this sentence, collectively, the "<u>Adequate Protection Payments</u>").<br><br>• <u>Budget and Reporting</u>.  All required written financial reporting and other periodic reporting that is provided to the DIP Agent, the DIP Lenders and the Sponsors.<br><br>• <u>Milestones</u>.  Milestones consistent with the RSA.<br><br>*See* Interim Order ¶¶ 4, 8, *See* DIP Credit Agreement, Section 5.19 |
| **Prepayment Features**<br>Local Rule 4001-2(a)(i)(E) | <u>Voluntary Prepayments</u>.   Upon prior notice in accordance with <u>Section 2.11(a)(iii)</u>, the Borrower shall have the right at any time and from time to time to prepay any Borrowing of the Loans of any Class in whole or in part without premium or penalty (but subject, if applicable, to <u>Section 2.16</u>). Each such prepayment shall be paid to the DIP Lenders and the Sponsors in accordance with their respective Applicable Percentages of the relevant Class.<br><br><u>Mandatory Prepayments</u>.  Subject in all respects to the DIP Order, no later than one Business Day following the receipt of Net Proceeds in respect of any Prepayment Asset Sale or Net Insurance/Condemnation Proceeds, the Borrower shall apply an amount equal to 100% of the Net Proceeds or Net Insurance/Condemnation Proceeds received with respect thereto (collectively, the "<u>Subject Proceeds</u>") to, subject to <u>Sections 2.18(b)</u> and <u>2.18(c)</u>, prepay the outstanding principal amount of the Lender New Money Loans and Roll-Up Loans.  For the avoidance of doubt, upon the full satisfaction of the outstanding principal amount of, and accrued and unpaid interest in respect of, the Lender New Money Loans, any remaining Net Insurance/Condemnation Proceeds with respect to the 2020 Business Interruption Policy shall be applied to prepay the outstanding principal amount of, and accrued and unpaid interest in respect of, the Roll-Up Loans.<br><br>In the event that Holdings, the Borrower or any of the Subsidiaries receives Net Proceeds from the issuance or incurrence of Indebtedness by Holdings, the Borrower or any of the Subsidiaries (other than Indebtedness that is permitted to be incurred under <u>Section 6.01</u>), Holdings, the Borrower or the relevant Subsidiary shall, concurrently with the receipt of such Net Proceeds by the relevant Person, apply an amount equal to 100% of such Net Proceeds to, subject to <u>Sections 2.18(b)</u> and <u>2.18(c)</u>, prepay the outstanding principal amount of Lender New Money Loans and Roll-Up Loans.<br><br>*See* DIP Credit Agreement, Section 2.11 |
| **Budget**<br>Bankruptcy Rule 4001(b)(1)(B)(ii)<br><br>Local Rule 4001-2(a)(ii) | The Approved Budget (subject to the Permitted Variances) shall set forth, on a weekly basis, among other things, Budgeted Operating Disbursement Amounts for the 13-week period commencing with the first full calendar week after the Petition Date and such Approved Budget shall be approved in writing by, and be in form and substance satisfactory to, the Required Lenders and the Sponsors. |
| **Variance Covenant**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The Borrower shall deliver to the DIP Agent and the Lenders on or before 5:00 p.m. on Friday of each week (commencing on August 7, 2020) a certificate which shall include such detail as is reasonably satisfactory to the |

| Summary of Material Terms | |
|---|---|
| Local Rule 4001-2(a)(ii) | Required Lenders and the Sponsors (which satisfaction may be communicated via an email from each of the Specified Lender Advisors and the Sponsor Advisors, as applicable), signed by a Responsible Officer of the Borrower certifying that (i) the Loan Parties are in compliance with the covenants contained in <u>Section 5.17(a)</u> and <u>Section 5.17(b)</u>, each of which shall be prepared by the Borrower as of the last day of the applicable Variance Testing Period or other period then most recently ended, and shall be in a form and substance satisfactory to the Required Lenders and the Sponsors in their sole discretion (which satisfaction may be communicated via an email from each of the Specified Lender Advisors and the Sponsor Advisors, as applicable). *See* Interim Order ¶ 4, *See* DIP Credit Agreement, Section 5.17 |
| **Termination Events/ Events of Default** Bankruptcy Rule 4001(b)(1)(B)(iii) Local Rule 4001-2(a)(ii) | Usual and customary for similar debtor-in-possession financings of this type, including, without limitation, non-payment of obligations, defaults under covenants (including, for the avoidance of doubt and without limitation, any variance beyond the permitted Budget Variance under the then-applicable Approved Budget or failure to meet any of the milestones set forth below), the making of representations and warranties that are incorrect in a material respect when made or deemed made, judgment defaults, failure to comply with ERISA rules and regulations, appointment of a bankruptcy trustee, examiner or receiver, invalidity of collateral documents, dismissal or conversion of the Chapter 11 Cases, certain other bankruptcy matters, failure to comply with the DIP Orders, entry of an order amending, modifying, staying, revoking or reversing the DIP Orders without the consent of the DIP Lenders and the Sponsors, termination of the Interim DIP Order or the Final DIP Order, as applicable, allowance of a claim under section 506(c) of the Bankruptcy Code, filing of a plan other than the Plan or a disclosure statement that is not in accordance with the terms and conditions of the RSA, termination of the use of Cash Collateral, payment of prepetition claims other than as permitted under the DIP Orders or the DIP Documents, entry of an order granting stay relief in respect of any DIP Collateral, granting any superpriority claim that is *pari passu* with or senior to those of the DIP Lenders or the Sponsors, termination of the RSA (other than pursuant to Section 13.02(a) of the RSA), and an unapproved sale of the assets that is not permitted under the DIP Facility. Subject to the terms of the DIP Order and to the Remedies Notice Period, if any Event of Default occurs and is continuing, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from the Bankruptcy Court, then, the DIP Agent upon the direction of either of the Required Lenders or the Sponsors (which direction may be communicated via an email from either of the Specified Lender Advisors or the Sponsor Advisors, as applicable)) (subject to <u>Article 9</u>) shall declare the existence of an Event of Default, and the DIP Agent (x) upon the request of the Required Lenders (which direction may be communicated via an email from the Specified Lender Advisors)  (subject to <u>Article 9</u>) solely with respect to amounts owing to the Lender New Money Lenders and the Roll-Up Lenders (y) request of the Sponsor (which direction may be communicated via an email from the Specifed Lender Advisors) with solely with respect to amounts owing to the Sponsor New Money Lenders  shall: (i) terminate, reduce or restrict the right or ability of the Loan Parties to use any cash collateral; (ii) |

| Summary of Material Terms | |
|---|---|
| | declare the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement to be due and payable forthwith, whereupon the same shall immediately become due and payable, (iii) subject to the Remedies Notice Period, (A) exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable law or (B) take any and all actions described in the DIP Order; and (iv) deliver a Carve-Out Trigger Notice.  For the avoidance of doubt, in any action in respect of the exercise of remedies by the Administrative Agent taken upon the request of the Required Lenders shall be taken solely in respect of the amounts owing to Lender New Money Lenders and the Roll-Up Lenders and in any action in respect of the exercise of remedies by the DIP Agent taken upon the request of the Sponsor shall be taken solely in respect of amounts owing to the Sponsor New Money Lenders.  In the event that both the Sponsors and the Required Lenders direct the DIP Agent (including in its capacity as "collateral agent" under the Loan Documents) to take actions set forth in clause (iii) of the preceding sentence, in the case of any conflict or inconsistency between the instructions or requests given by the Sponsors and the instructions given by the Required Lenders, the instructions given by the Required Lenders shall control.  <br><br>At any hearing during the Remedies Notice Period to contest the enforcement of remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred, and the Loan Parties hereby waive their right to and shall not be entitled to seek relief, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent that such relief would in way impair or restrict the rights and remedies of the DIP Agent or the Secured Parties, as set forth in this Agreement, the applicable DIP Order or other Loan Documents.  Except as expressly provided above in this Article 7, to the maximum extent permitted by applicable Requirements of Law, presentment, demand, protest and all other notices of any kind are hereby expressly waived.  <br><br>*See*  DIP Credit Agreement, Sections 7.01-7.02 |
| **Indemnification**<br><br>Bankruptcy Rule<br><br>4001(c)(1)(B)(ix) | The Loan Parties will indemnify the DIP Lenders, the Sponsors, the DIP Agent, and their respective affiliates, successors, and assigns and the officers, directors, employees, agents, attorneys, advisors, controlling persons, and members of each of the foregoing (each an "Indemnified Person") and hold them harmless from and against all costs, expenses (including but not limited to reasonable and documented legal fees and expenses), and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the DIP Facility; provided that no such person will be indemnified for costs, expenses, or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the gross negligence, actual fraud, or willful misconduct of such person (or their related persons).  No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's gross negligence, actual fraud, or willful misconduct or breach of |

18

| Summary of Material Terms | |
|---|---|
| | their obligations under the DIP Facility, and in no event shall any Indemnified Person be liable on any theory of liability for any special, indirect, consequential, or punitive damages.<br><br>*See* Interim Order ¶ 18 |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(i) | The following secured parties have an interest in Cash Collateral:<br><br>• DIP Secured Parties<br><br>• Prepetition Secured Parties<br><br>*See* Interim Order ¶ F |
| **Carve Out**<br>Bankruptcy Rule 4001(b)(1)(B)(iii)<br><br>Local Rule 4001-2(a)(i)(F) | The Interim Order provides a "Carve Out" of certain statutory fees, allowed professional fees of the Debtors, any chapter 7 trustee fees incurred by a trustee under section 726(b) of the Bankruptcy Code, subject to a $75,000 cap, and any official committee of unsecured creditors appointed under section 1102 of the Bankruptcy Code appointed in the chapter 11 cases pursuant to section 1103 of the Bankruptcy Code, all as detailed in the Interim Order.<br><br>*See* Interim Order ¶ 9 |
| **Fees**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | The Borrower agrees to pay to the DIP Agent, for its own account and for the account of each Lender, as the case may be, the fees and other amounts due under the terms of the Fee Letters, in accordance with the applicable terms thereof.<br><br>The Borrower agrees to pay to each Pre-Petition Issuing Bank, for its own account, on the last Business Day of each March, June, September and December, a fee in respect of each Existing Letter of Credit issued by such Pre-Petition Issuing Bank for the period from and including the Closing Date to and including the earlier of (x) the termination of such Existing Letter of Credit and (y) the Maturity Date, computed at a rate equal to 12.00% per annum of the daily stated amount of such Existing Letter of Credit, plus in connection with any amendment or extension of such Existing Letter of Credit or any Existing Letter of Credit Disbursement thereunder, such Pre-Petition Issuing Bank's customary documentary and processing fees and charges.<br><br>*See* DIP Credit Agreement, Section 2.12 |
| **Liens on Avoidance Actions**<br><br>Local Rule 4001-2(a)(i)(D) | Subject to and upon entry of the Final DIP Order, the DIP Liens shall attach to the proceeds of any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553 or any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law.<br><br>*See* Interim Order ¶ 7 |
| **Waiver/Modification of Automatic Stay**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iii) | The automatic stay imposed under section 362(a) of the Bankruptcy Code is modified solely to the extent necessary to effectuate all of the terms and provisions of the Interim Order, including to:<br><br>• permit the Debtors to grant the Adequate Protection Liens and the Superpriority Claim;<br><br>• permit the Debtors to perform such acts as the Administrative Agent |

| Summary of Material Terms |
| --- |

|  | may request in its reasonable discretion to assure the perfection and priority of the liens granted herein; |
| --- | --- |
|  | • permit the Debtors to incur all liabilities and obligations to the Administrative Agent and the Prepetition Secured Parties under the Interim Order; and |
|  | • subject to the Carve Out, authorize the Debtors to pay, and the Administrative Agent and the Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of the Interim Order; |
|  | *provided* that, during the Remedies Notice Period, the automatic stay under section 362 of the Bankruptcy Code (to the extent applicable) shall remain in effect. |
|  | *See* Interim Order ¶ 3 |
| **Stipulations to Prepetition Liens and Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(iii)<br><br>Local Rule 4001-2(a)(i)(B) | After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties-in-interest, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree immediately upon entry of the Interim Order, to certain stipulations regarding the validity and extent of the Prepetition Lenders' claims and liens.<br><br>*See* Interim Order ¶ E |
| **Liens and Priorities**<br><br>Bankruptcy Rule<br>4001(c)(1)(B)(i)<br><br>Local Rule 4001-2(a)(i)(D) and (G), 4001-2(a)(4) | The obligations of the DIP Facility Borrower and the Guarantors to the DIP Lenders, the Sponsors and the DIP Agent shall, subject to the Carve Out (as defined below), at all times:<br><br>• be entitled to superpriority administrative expense claim status in the Chapter 11 Case of each Loan Party having priority over all administrative expenses and claims, of any kind or nature whatsoever, specified in, or ordered pursuant to Sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(b), 506(c), 507(a), 507(b), 546, 552, 726, 1113 or 1114 or any other provisions of the Bankruptcy Code, subject only to the Carve-Out;<br><br>• be secured by a perfected first priority security interest and lien on all DIP Collateral that was not, on the Petition Date, subject to valid, enforceable, non-avoidable and perfected security interests and liens;<br><br>• be secured by a junior perfected security interest and lien on the DIP Collateral of each Loan Party to the extent such DIP Collateral was, as of the Petition Date, subject to valid, binding, perfected and non-avoidable senior liens in favor of third parties that were in existence immediately prior to the Petition Date and permitted under the Prepetition Credit Agreement, or to valid and non-avoidable permitted senior liens in favor of third parties that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (in each case, other than the Prepetition Liens of the Prepetition Secured Parties, which Prepetition Liens will be primed by the liens described in the next clause); and<br><br>• be secured by a perfected priming security interest and lien on the DIP |

| Summary of Material Terms | |
| --- | --- |
| | Collateral of each Loan Party to the extent such DIP Collateral is subject to Prepetition Liens that secure the Prepetition Secured Obligations of the Prepetition Secured Parties.<br><br>See Interim Order ¶¶ 6–7 |
| **Milestones**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | The Borrower shall, or shall cause the following to occur, by the times and dates set forth below (as any such time and date may be extended, or any of such milestones set forth below may be modified, with the consent of the Required Lenders and the Sponsors (which consent, and any consent of the Required Lenders and the Sponsors described below in clauses (a), (b) and (c), may be communicated via an email from each of the Specified Lender Advisors and the Sponsor Advisors, as applicable)):[6]<br><br>• by no later than one (1) day following the Petition Date, the Borrower shall have filed the Chapter 11 Plan (votes for which shall have already been solicited as of the Solicitation Commencement Date and pursuant to the Solicitation Materials (each term as defined in the RSA)), Chapter 11 Plan Disclosure Statement, and the related motions seeking approval of the adequacy of the Chapter 11 Plan Disclosure Statement and approval of the Prepack Scheduling Order, in each case, in form and substance reasonably acceptable to the Required Lenders, the Sponsors (which acceptance may be communicated via an email from each of the Specified Lender Advisors and the Sponsor Advisors) and the Borrower;<br><br>• no later than three (3) days following the Petition Date, the Bankruptcy Court shall enter the Interim Order and the Prepack Scheduling Order, in each case, in form and substance reasonably acceptable to the Required Lenders and the Sponsors (which acceptance may be communicated via an email from each of the Specified Lender Advisors and the Sponsor Advisors) and the Borrower;<br><br>• no later than thirty (30) days following the Petition Date, the Bankruptcy Court shall enter the Final Order in form and substance reasonably acceptable to the Required Lenders and the Sponsors (which acceptance may be communicated via an email from each of the Specified Lender Advisors and the Sponsor Advisors) and the Borrower;<br><br>• no later than sixty (60) days following the Petition Date, the Bankruptcy Court shall enter an order confirming the Chapter 11 Plan and approving the Chapter 11 Plan Disclosure Statement and related Solicitation Materials (as defined in the RSA) in form and substance reasonably acceptable to the Required Lenders and the Sponsors (which acceptance may be communicated via an email from each of the Specified Lender Advisors and the Sponsor Advisors) and the Borrower; and<br><br>• no later than seventy-five (75) days following the Petition Date, the effective date of the Chapter 11 Plan shall have occurred.<br><br>*See* DIP Credit Agreement, Section 5.19 |

---

[6]  The date of each Milestone provided for in Article V of the DIP Credit Agreement shall be calculated in accordance with Rule 9006 of the Federal Rules of Bankruptcy Procedure.

| Summary of Material Terms | |
|---|---|
| **Challenge Period**<br>Bankr. R. 4001(b)(1)(B)(iii)<br><br>Local Rule 4001-2(g)(4)(A) | "<u>Challenge Period</u>" means before the earlier of (a) except as to any Committee, seventy-five (75) calendar days after entry of the Interim Order, and (b) in the case of any such adversary proceeding or contested matter filed by any Committee, sixty (60) calendar days after the appointment of such Committee, subject to further extension by written agreement of the Debtors (in their sole discretion) and the Prepetition Administrative Agent (acting at the direction of the requisite Prepetition Lenders).<br><br>*See* Interim Order ¶ 12 |
| **506(c) Waiver**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iii)<br><br><br>Local Rule 4001-2(a)(i)(C) | Subject to entry of the Final Order granting such relief, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral or the DIP Collateral (except to the extent of the Carve Out), the DIP Agent, the DIP Lenders, the Sponsors, or the Prepetition Secured Parties pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the Administrative Agent, the DIP Lenders, the Sponsors, and the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, the Sponsors, or the Prepetition Secured Parties.<br><br>*See* Interim Order ¶ 16 |
| **Section 552(b) Waiver**<br>Local Rule 4001-2(a)(i)(H) | The Prepetition Secured Parties shall each be entitled to all the rights and benefits of section 522(b) of the Bankruptcy Code, and, subject to and upon entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, product, offspring, or profits of any of the Collateral (including the Prepetition Collateral).<br><br>*See* Interim Order ¶ 36 |

## <u>The Debtors' Prepetition Capital Structure</u>

16.    As of the Petition Date, the Debtors have approximately $768 million of funded debt.   This amount includes $642 million under the Prepetition Credit Agreement and approximately $126 million of Seller Notes (each as defined herein).

17.    As of the Petition Date, the Debtors maintain a senior secured credit facility (the "<u>Prepetition Credit Agreement</u>") consisting of: (a) $425 million term loan, (b) $35 million delayed draw term loan, (c) $58 million revolving credit facility (the "<u>Revolving Credit Facility</u>") and approximately $2 million of Existing Letters of Credit relating thereto, (d) $85 million first incremental term loan, and (e) $50 million second incremental term loan under that certain credit

agreement, dated as of December 15, 2017 (as may be amended, modified, or supplemented from time to time).  Presently, there is approximately $642 million in aggregate principal amount outstanding under the Prepetition Credit Agreement, which includes $58 million under the Revolving Credit Facility and approximately $2 million of Existing Letters of Credit.

18.     The Debtors are party to three interest rate derivative transactions (the "Existing Hedges") secured *pari passu* with the obligations under the Prepetition Credit Agreement with the Consenting Hedge Provider, an affiliate of Goldman Sachs.  The Existing Hedges have an aggregate notional principal amount of approximately $429 million and a weighted average fixed rate of 2.66 percent per annum, and each of the Existing Hedges has a quarterly payment frequency and matures on May 15, 2022.  Under the Existing Hedges, the Debtors owe payments to the Consenting Hedge Provider based on the applicable fixed rate and the Consenting Hedge Provider owes payments to the Debtors based on three-month LIBOR with a floor of 1.00%.  As of the Petition Date, the Existing Hedges had a negative mark-to-market value to the Debtors of approximately $13.7 million in the aggregate.

19.     In connection with the Sale and Merger Agreement, certain of the Debtors issued a series of subordinated, unsecured promissory notes in the initial aggregate principal amount of $100 million to Globetrotter Co-Investment B LP and to the selling equity holders of Lakeland Holdings, LLC (the indirect parent of each of the Initial Borrower and the Successor Borrower under the Prepetition Credit Agreement), all of which are currently outstanding (the "Seller Notes").  As a result of accruing PIK interest in respect of the Seller Notes, the aggregate amount outstanding is now approximately $126 million.

20.     As of the Petition Date, WorldStrides' parent, Debtor Lakeland Holdings, LLC, had approximately 63,768,916 shares of common units issued and outstanding.

## The Proposed DIP Facility

**I.      The Debtors' Need for Access to DIP Financing and Use of Cash Collateral.**

21.      The Debtors require access to additional liquidity to ensure that they are able to continue operating their business during the Cases and preserve the value of their estates for the benefit of all parties in interest.

22.      As part of the Debtors' preparations for the Cases, the Debtors and their advisors analyzed how much postpetition financing would be required to operate the Debtors' businesses as planned after the Effective Date and fund the administrative costs of this chapter 11 process. As part of this analysis, the Debtors and their advisors analyzed and quantified the liquidity impact of its customer refund commitment, which took into account an extensive analysis of these obligations, the market backdrop, potential operational cost savings opportunities, impact on business and customer relations, and anticipated future cash inflows.  *See* Spencer Decl. ¶ 8.

23.      Based on this analysis, the Debtors determined that they would require incremental liquidity to operate postpetition and satisfy all administrative costs and expenses, including honoring their customer deposit refund policies and required adequate protection payments to their Prepetition Lenders in exchange for the consensual use of Cash Collateral.  The Debtors believe that their ability to continue funding ongoing operations during the Cases is essential to the preservation of the Debtors' assets and their ability to maximize the value of those assets through a reorganization.

24.      The Debtors also believe that the DIP Facility and access to Cash Collateral will provide a strong, clear message to their customers, vendors, employees, and contract counterparties that operations are appropriately funded and that the bankruptcy filing will not impact the Debtors' businesses operationally.  Specifically, access to liquidity will signal that the

Debtors are able to continue meeting the needs of their customers, provide compensation to their employees, and manage their businesses in the ordinary course.

### A.  Alternative Sources of Financing Are Not Available on Better Terms.

25.    In consultation with the Debtors and their advisors, in mid May 2020, Houlihan Lokey Capital, Inc. ("Houlihan") commenced a financing process to secure funding for the Debtors' operational requirements.  As part of this process, Houlihan engaged with the Ad Hoc Group, the Sponsors, and their respective financial and legal advisors in an effort to develop and negotiate a plan of reorganization to finance the Debtors' projected liquidity needs and service their debt obligations in light of the Debtors' capital structure (approximately $768 million in total debt obligations consisting of approximately (a) $642 million under the senior secured Prepetition Credit Agreement and (b) approximately $126 million in unsecured Seller Notes that are structurally subordinated to all unsecured claims of the Debtors' operating entities).  This process entailed numerous rounds of negotiation. *See* Spencer Decl. ¶ 12.

26.    Before, during, and after the period in which the Ad Hoc Group and the Sponsors entered into a productive dialogue around the plan of reorganization, Houlihan explored various alternative financing options.  These financing efforts included a targeted process designed to obtain a secured bridge financing package, collateralized by anticipated proceeds from the Debtors' business interruption insurance policy. *See* Spencer Decl. ¶ 14.  As part of this process and to avoid information leakage, Houlihan approached a select number of prospective lenders to gauge market interest and indicative terms. *See* Spencer Decl. ¶ 16.  In total, Houlihan reached out to 22 lenders; eight lenders executed non-disclosure agreements and received confidential information and two parties submitted an indication of interest.  *Id*.  The financing indications received were expensive, with a targeted multiple of investment capital of roughly 1.5x and a twelve-month internal rate of return target of approximately 65%.  *Id*.  Given the high cost of

capital implied by the proposed terms, Houlihan recommended that the Debtors decline to pursue the insurance bridge financing process further and continue negotiations with the Ad Hoc Group and Sponsors. *Id.*

27.    In addition to the bridge financing process, Houlihan pursued discussions around potential alternative financing options with individual senior secured investors (both within and outside of the Ad Hoc Group) and new third party investors.    *See* Spencer Decl. ¶ 17.  These discussions produced important market feedback with two consistent messages:  (i) none of the potential existing or third party investors were willing to offer financing to the Debtors with a security interest junior to the current senior secured debt obligations; and (ii) all of these parties viewed the Debtors' prepetition senior secured debt as impaired, with the Debtors' enterprise value below the par value of the senior secured debt amount (*i.e.*, the amount owed to the Prepetition Lenders).  *Id.*  Moreover, after confidential information that restricted the Ad Hoc Group was released, Houlihan followed up with potential third party investors who previously expressed interest in providing financing to the Debtors but none of these investors expressed interest in providing a competing DIP financing proposal on more favorable economic terms than the proposed DIP Facility.  *See* Spencer Decl. ¶ 18

28.    Despite the previously indicated challenges, after extensive, arm's-length negotiations with the Prepetition Secured Parties, and the Sponsors, the Debtors were able to secure the proposed approximately $351.8 million DIP Facility.  *See* Spencer Decl. ¶ 20.  The DIP Facility is critical to the Debtors' ability to pay the administrative costs of these chapter 11 cases and provide the Debtors with sufficient liquidity to operate their business without creating a "priming" or valuation dispute at the outset of the chapter 11 cases.  *See* Spencer Decl. ¶ 22.  In tandem with the Debtors' RSA, moreover, the DIP Facility provides a path to emergence that is

important to ensuring a reorganization, rather than the alternative, which would be far worse for all creditors and stakeholders. *Id*.

29.     Based on the financing process described above, there are no alternative sources of financing reasonably available to the Debtors and no alternative sources of financing available on both better and executable terms than those being provided under the DIP Facility by the DIP Lenders and the Sponsors. No party that Houlihan communicated with as part of the marketing process, and no other party that Houlihan is aware of, was interested in providing, or willing to provide, postpetition financing to the Debtors on an unsecured basis. Indeed, no party was willing to provide postpetition financing on anything other than a "priming" basis with respect to substantially all of the Debtors' assets, which "priming" liens would not have been consented to by the Prepetition Secured Lenders and Sponsors, and would have subject the Debtors to a priming dispute. Accordingly, the DIP Facility pending approval before the Bankruptcy Court is reasonable and appropriate and is the Debtors' best—and only—available options.

<u>**Basis for Relief**</u>

**II.     The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Documents.**

**A.     Entry into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.**

30.     The Bankruptcy Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and continue using Cash Collateral. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant a debtor considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See In re Barbara K.*

*Enters., Inc.*, Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *see also In re Republic Airways Holdings Inc.*, No. 16-10429 (SHL), 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016) ("In determining whether to authorize post-petition financing, bankruptcy courts will generally defer to the debtor's business judgment.").

31.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of the debtor's authority under the [Bankruptcy] Code").

32.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus.* 294 B.R. at 886; *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard

bargains" to acquire funds for its reorganization); Hr'g Tr. at 734-35:24, *In re Lyondell Chem. Co.*,

No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009) (recognizing that "the terms that are now available

for DIP financing in the current economic environment aren't as desirable" as in the past).  The

Bankruptcy Court may also appropriately take into consideration non-economic benefits to the

Debtors offered by a proposed postpetition facility.  For example, in *In re ION Media Networks,*

*Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are
> naturally motivated to obtain financing on the best possible terms, a
> business decision to obtain credit from a particular lender is almost
> never based purely on economic terms.  ***Relevant features of the***
> ***financing must be evaluated, including non-economic elements***
> ***such as the timing and certainty of closing, the impact on creditor***
> ***constituencies and the likelihood of a successful reorganization.***
> This is particularly true in a bankruptcy setting where cooperation
> and establishing alliances with creditor groups can be a vital part of
> building support for a restructuring that ultimately may lead to a
> confirmable reorganization plan.  That which helps foster consensus
> may be preferable to a notionally better transaction that carries the
> risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

33.    The Debtors' determination to move forward with the DIP Facility is an exercise

of their sound business judgment following an extensive arm's-length process and careful

evaluation of available alternatives.  Specifically, the Debtors and their advisors determined that

the Debtors would require postpetition financing to support their operational and chapter 11

activities.  The DIP Facility will allow the Debtors to:  (a) fund certain costs, fees, and expenses

related to the Cases; (b) provide Adequate Protection Payments (as defined in the Interim Order);

(c) fund the fees, interest, payments, and expenses associated with the DIP Facility, including fees,

costs, and expenses incurred by the DIP Agent, the DIP Lenders and/or the Sponsors; and (d) fund

the working capital needs, capital improvements, and expenditures related to the Cases.  The

Debtors negotiated the DIP Facility and other DIP Documents with the DIP Secured Parties in

good faith, at arm's length, and with the assistance of their respective advisors, and the Debtors believe that they have obtained the best financing available under the circumstances. Accordingly, the Bankruptcy Court should authorize the Debtors' entry into the DIP Credit Agreement, as it is a reasonable exercise of the Debtors' business judgment.

### B.     The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.

34.     The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Documents pursuant to section 364(c) of the Bankruptcy Code. Specifically, the Debtors propose to provide to the DIP Lenders and the Sponsors continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on the DIP Collateral, subject to the Carve Out.

35.     The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

   a.     the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

   b.     the credit transaction is necessary to preserve the assets of the estate; and

   c.     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Los Angeles Dodgers LLC*, 457 B.R. 308 (Bankr. D. Del. 2011); *See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

36.     As described above and as set forth in the Spencer Declaration, during the Debtors' prepetition marketing process, no third-party lender indicated it would be willing to provide postpetition financing on an unsecured, *pari passu*, or junior-lien basis to the Prepetition Secured Parties.  *See* Spencer Decl. ¶ 17.  As a result of the marketing process and Houlihan's discussions with numerous parties, it was also well-known in the market that the Debtors would require and be seeking DIP financing.  Nevertheless, the Debtors did not receive any competitive third-party DIP financing proposals.  The DIP Facility is therefore the best DIP financing available to the Debtors under the circumstances to provide liquidity during the Cases.  *See* Spencer Decl. ¶ 27.

37.     Absent the DIP Facility, which will provide assurances that the Debtors will have sufficient liquidity to administer the Cases, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  Without postpetition financing, the Debtors lack sufficient funds to operate their enterprise, continue paying their debts as they come due, and cover the projected costs of the Cases.  Lack of postpetition financing likely means it will also become increasingly difficult for the Debtors to continue honoring their customer deposit refund policies.  Under the circumstances, the Debtors believe that the terms of the DIP Facility as set forth in the DIP Document is reasonable for the reasons provided more fully above and in the Spencer Declaration.  For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

38.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the

Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c). As described above, the Debtors are unable to obtain unsecured credit. Therefore, approving a superpriority claim in favor of the DIP Lenders and the Sponsors is reasonable and appropriate.

39.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). The Debtors may incur "priming" liens under the DIP Facility to the extent such DIP Collateral is subject to Prepetition Liens that secure the Prepetition Secured Obligations of the Prepetition Secured Parties. What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims. *In re Mosello,* 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case."); *In re Realty Sw. Assocs.*, 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992) ("'Adequate protection' is a question of fact because it has as its linchpin the concept of value, and therefore is determined on a case-by-case basis.") (citation omitted); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate

protection "is left to the vagaries of each case, but its focus is protection of the secured creditor

from diminution in the value of its collateral during the reorganization process") (citation omitted).

40.       Here, a substantial majority of the Prepetition Secured Parties have affirmatively

consented to the DIP Facility and actively participated in facilitating the proposed DIP Facility.

Moreover, as set forth more fully in the Interim Order, the Debtors propose to provide a variety of

adequate protection to protect the interests of the Prepetition Secured Parties.  Therefore, the relief

requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

### C.       No Comparable Alternative to the DIP Facility Is Reasonably Available on More Favorable Overall Terms.

41.       A debtor need only demonstrate "by a good faith effort that credit was not available

without" the protections afforded to potential lenders by section 364(c) of the Bankruptcy Code.

*In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber*

*Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only

a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and

unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky*

*Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank*

*FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Ames Dep't Stores*,

115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of

financing under sections 364(a) and (b)) (citing *Snowshoe Co.*, 789 F.2d at 1088 (demonstrating

that credit was unavailable absent the senior lien by establishment of unsuccessful contact with

other financial institutions in the geographic area)); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663

(D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured

loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't*

*Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources

of financing under sections 364(a) and (b)); *see also In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most banks lend money only in return for a senior secured position").

42.     As noted above, the Debtors do not believe that more favorable alternative debtor-in-possession financing is reasonably available given the realities imposed by the Debtors' customer refund commitment and the Debtors' solicitation of alternative financing proposals through an extensive prepetition marketing process.   Additionally, the Debtors' overall restructuring is closely tied to the transactions described in the RSA.   Thus, the Debtors have determined that the DIP Facility provides the most favorable terms available, is an integral piece of the transactions contemplated by the RSA, and is provided on reasonable terms under the circumstances.   Simply put, the DIP Facility provides the Debtors with the liquidity they need at the lowest cost available while simultaneously placing the Debtors on an optimal path for successfully implementing the reorganization on an expeditious basis.   Therefore, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

**D.      The Repayment Features of the DIP Facility is Appropriate.**

43.     On a final basis, upon entry of the Interim Order, without any further action by the Debtors or any other party, $150 million of the Prepetition Loans will be converted into the DIP Roll Up Loans.   Such conversion (or "roll-up") is in consideration for, and solely on account of, the agreement of the Prepetition Lenders that are also DIP Lenders (or affiliates thereof) to fund the Lender DIP Loans.   The Prepetition Secured Parties would not otherwise consent to the use of their Cash Collateral or the subordination of their liens to the DIP Liens, and the DIP Lenders would not be willing to provide the Lender DIP Loans or extend credit to the Debtors thereunder

without the inclusion of the DIP Roll Up Loans in the DIP Obligations.  Therefore, the roll-up of

funds is a sound exercise of the Debtors' business judgment, is a material component of the DIP

Facility, and is required by the DIP Lenders as a condition to their commitments to provide

postpetition financing.  The Debtors were unable to obtain DIP financing on similar terms that did

not provide for the repayment of prepetition amounts.  *See* Spencer Decl. ¶ 18.

44.     The DIP Lenders made it clear that they were unwilling to continue to lend

postpetition without the repayment of their prepetition claims in the amounts and at the intervals

set forth in the Interim Order and DIP Credit Agreement.  Moreover, the Debtors' agreement to

"roll-up" the Prepetition Loans will benefit the estates by, among other things, creating greater

availability under the DIP Facility and facilitating the DIP Lenders' agreement to make certain

revisions to the borrowing base and waive certain defaults.  Further, the Debtors were unable to

obtain an offer for financing on similar terms that did not provide for the repayment of the

Prepetition Loans in full.  Thus, after careful consideration of all available alternatives, the Debtors

determined that such repayments were appropriate to obtain access to the DIP Facility, which will

benefit all stakeholders.

45.     Courts consider a number of factors when determining whether to authorize

repayment of prepetition debt into postpetition financing facilities, including whether: (a) the

proposed financing is an exercise of sound and reasonable business judgment; (b) no more

favorable alternative financing is available; (c) the financing is in the best interests of the estate

and its creditors; (d) no better offers, bids, or timely proposals are before the court; (e) the credit

transaction is necessary to preserve the assets of the estate; (f) the terms of the transaction are fair,

reasonable, and adequate given the circumstances of the debtor and proposed lender(s); (g) the

financing is necessary, essential, and appropriate for the continued operating of the debtors'

business and the preservation of their estates; and (h) the financing agreement was negotiated in good faith and at arm's-length between the debtors and the proposed lenders. *See In re Farmland Indus., Inc.*, 294 B.R. at 879–80.

46.    Without the incremental liquidity under the DIP Facility to pay down the postpetition indebtedness under the DIP Facility and the continued ability to fund the administration of the Cases, finance operational restructuring and cost-savings initiatives, and, importantly, make payments to the Debtors' vendors and other participants in the Debtors' supply chain to support the Debtors in their businesses, the Debtors' businesses would cease and it would likely be forced to liquidate. Maintaining the ability to continue as a going concern is of immense benefit to the Debtors' estates and will maximize value for the benefit of all of its stakeholders. *See* Spencer Decl. ¶ 21.

47.    Recognizing exigent circumstances like those described above, courts in this district, as well as elsewhere, have approved repayments funded by debtor-in-possession financing proceeds in recent chapter 11 cases on an interim and final basis. *See, e.g.*, *In re BCBG Max Azria Global Holdings, LLC*, Case No. 17-10466 (SCC) (Bankr. S.D.N.Y. Mar. 2, 2017) (approving interim roll-up of $35 million); *In re Avaya Inc.*, Case No. 17-10089 (SMB) (Bankr. S.D.N.Y. Jan. 23, 2017) (approving interim roll-up of $105 million); *In re Aéropostale, Inc.*, Case No. 16-11275 (Bankr. S.D.N.Y. May 6, 2016) (approving interim roll-up of $78 million); *In re Chassix Holdings, Inc.*, Case No. 15-10578 (MEW) (Bankr. S.D.N.Y. Mar. 13, 2015) (approving interim roll-up of $135 million); *In re United Retail Grp, Inc.*, Case No. 12-10405 (SMB) (Bankr. S.D.N.Y. Feb. 3, 2012) (approving interim roll-up of $11.5 million); *In re Uno Rest. Holdings Corp.*, Case

No. 10-10209 (MG) (Bankr. S.D.N.Y. Feb. 18, 2010) (approving interim roll-up of $33.9 million).[7]

48.    Importantly, the portion of the roll-up effective upon entry of the Interim Order is subject to Local Rule 4001-2(g)(5), which reserves the right of the Bankruptcy Court to unwind or partially unwind the pay down of the prepetition debt in the event there is a timely and successful challenge to the validity, enforceability, extent, perfection or priority of a prepetition lender's claims or liens, or a determination that prepetition debt was undersecured as of the petition date, and the cross-collateralization or rollup unduly advantaged the lender.

49.    Consistent with this authority, the Debtors respectfully submit that the Bankruptcy Court should approve the Debtors' decision to enter into the DIP Facility.

**III.    The Debtors Should Be Authorized to Use the Cash Collateral.**

50.    Section 363 of the Bankruptcy Code governs the Debtors' use of property of their estates, including Cash Collateral.[8] Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Here, the DIP Lenders,

---

[7]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

[8]    The Bankruptcy Code defines "cash collateral" as:

Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

the Sponsors and the Prepetition Secured Parties consent or are deemed to consent to the Debtors'

use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order.

51.    Section 363(e) of the Bankruptcy Code provides for adequate protection of interests

in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code

provides for adequate protection of interests in property due to the imposition of the automatic

stay.  *See, e.g., In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("The determination of

adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *In re Realty*

*Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736

(Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case,

but its focus is protection of the secured creditor from diminution in the value of it collateral during

the reorganization process") (citation omitted); *In re Satcon Tech. Corp.*, No. 12-12869 (KG),

2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *see also In re Dynaco Corp.*, 162 B.R.

389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed.

1993)) (explaining that adequate protection can take many forms and "must be determined based

upon equitable considerations arising from the particular facts of each proceeding" (citations

omitted)).

**A.    Adequate Protection Provided to the Prepetition Lenders.**

52.    As described more fully below and as set forth in the Interim Order, the Debtors

propose to provide the Prepetition Secured Parties with certain forms of adequate protection to

protect against the postpetition Diminution in Value of the Cash Collateral resulting from the use,

sale, or lease of the Cash Collateral by the Debtors, priming of the Prepetition Secured Parties'

security interests and liens in the Prepetition Collateral, and the imposition of the automatic stay

(collectively, the "Adequate Protection Obligations" as defined in the Interim Order), in the form of:

    a.    Adequate Protection Superpriority Claims (as defined in the Interim Order);

    b.    Adequate Protection Liens (as defined in the Interim Order);

    c.    Adequate Protection Payments (as defined in the Interim Order);

    d.    financial reporting and other reports and notices delivered by the Debtors under the DIP Facility;

    e.    milestones consistent with the RSA; and

    f.    the right to seek additional adequate protection.

53.    The Debtors submit that the proposed Adequate Protection Obligations are sufficient to protect the Prepetition Secured Parties from any potential Diminution in Value to the Cash Collateral. In light of the foregoing, the Debtors further submit, and the Prepetition Secured Parties agree, that the proposed Adequate Protection Obligations to be provided for the benefit of the Prepetition Secured Parties are appropriate. Thus, the Debtors' provision of the Adequate Protection Obligations is not only necessary to protect against any Diminution in Value but is fair and appropriate under the circumstances of the Cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

**IV.    The Debtors Should Be Authorized to Pay the Fees Required by the DIP Lenders and the Sponsors Under the DIP Documents.**

54.    Under the DIP Documents, the Debtors have agreed, subject to Bankruptcy Court approval, to pay certain fees to the DIP Agent, the DIP Lenders and the Sponsors. In particular, as noted above, the Debtors have agreed to pay:

    (i)    a commitment fee of 3.00% of the aggregate principal amount of the DIP Loans committed to be provided by all DIP Lenders and the Sponsors;

(ii)     a backstop fee equal to 5.00% of the aggregate principal amount of the DIP Loans committed to be provided by all DIP Lenders and the Sponsors, which fee shall only be payable to the Backstop Group (as defined in the Restructuring Term Sheet) and the Sponsors; and

(iii)    a fronting premium equal to 25 bps of the aggregate principal amount of the DIP Loans committed to be provided by the Ad Hoc Group or Consenting Lenders.

55.     Courts in this district and others have approved similar aggregate fees in large chapter 11 cases. *See, e.g.*, *In re Sungard Availability Serv's Capital, Inc.*, No. 19-22915 (RDD) (Bankr. S.D.N.Y. May 1, 2019) (approving upfront and commitment fees of 3% of the committed DIP amount and 2.5% of the average daily unused delayed draw, respectively); *In re Nine West Holdings, Inc.*, No. 18-10947 (SCC) (Bankr. S.D.N.Y. April 4, 2018) (approving an upfront fee of 7.75% of the aggregate commitments and an exit fee of 2.50% of the aggregate commitments); *In re BCBG Max Azria Global Holdings, LLC*, No. 17-10466 (Bankr. S.D.N.Y. March 28, 2017) (approving 3.5% DIP closing fee); *In re NR Liquidation III Co. (f/k/a Neff Corp.)*, Case No. 10-12610 (SCC) (Bankr. S.D.N.Y. June 30, 2010) (approving 3.1% DIP and exit facility fee).

56.     The fees and rates to be paid under the proposed DIP Facility were the subject of arm's-length and good faith negotiation between the Debtors, the DIP Lenders, and the Sponsors, are an integral component of the overall terms of the proposed DIP Facility, and were required by the DIP Lenders and Sponsors as consideration for the extension of debtor-in-possession financing, and by the DIP Lenders as consideration for the extensions of postpetition financing.  *See* Spencer Decl. ¶ 24.  Accordingly, the Bankruptcy Court should authorize the Debtors to pay the fees provided under the DIP Documents in connection with entering into those agreements.

**V.     The DIP Lenders and the Sponsors Should Be Deemed Good-Faith Lenders Under Section 364(e).**

57.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

58. As explained herein, in the Spencer Declaration, and in the First Day Declaration, the DIP Documents are the result of: (a) the Debtors' reasonable and informed determination that the DIP Lenders and the Sponsors provided the best financing alternative available under the circumstances; and (b) extended arm's length, good-faith negotiations between the Debtors, the DIP Lenders and the Sponsors. The Debtors submit that the terms and conditions of the DIP Documents are reasonable under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Documents other than as described herein or in the DIP Documents. Accordingly, the Bankruptcy Court should find that the DIP Lenders and the Sponsors are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

## VI. The Scope of the Carve Out Is Appropriate.

59. The proposed Adequate Protection Obligations are subject to the Carve Out. Without the Carve Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in the Cases would be restricted. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent

such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). The Carve Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers. Additionally, the Carve Out protects against administrative insolvency during the course of the Cases by ensuring that assets remain for the payment of the Clerk of the Bankruptcy Court or U.S. Trustee fees and professional fees of the Debtors.

**VII.   The Findings of Validity, Perfection, or Amount of Prepetition Liens and Challenge Period Are Appropriate.**

60.     Local Rule 4001-2(g)(4)(A) requires explicit disclosure of provisions that bind the estate or other parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the creditor's committee, if any, at least sixty (60) days from the date of its formation to investigate such matters. Here, the Interim Order provides any committee appointed in the Cases and other parties in interest with sufficient time within which to investigate and/or challenge the Prepetition Obligations.

61.     As part of the Interim Order, the Debtors agree and stipulate that the Prepetition Liens are valid, binding, perfected, enforceable, first priority liens and security interests against the Prepetition Collateral, subject in each case to the Prepetition Secured Parties' respective rights in such collateral. The Interim Order further provides that, subject to certain limitations, the Committee (if any) or any other party in interest (except the Debtors), in each case, with requisite standing, may file an adversary proceeding challenging the validity, enforceability, priority, or extent of the Prepetition Obligations or the Prepetition Liens by the earlier of (i) except to the Committee (if any), seventy-five (75) calendar days following the date of entry of the Interim Order and (b) in the case of any such adversary proceeding or contested matter filed by any

Committee, sixty (60) calendar days after the appointment of such Committee, subject to further

extension by written agreement of the Debtors (in their sole discretion) and the Prepetition

Administrative Agent (acting at the direction of the requisite Prepetition Lenders).

## VIII.   Failure to Obtain Immediate Interim Access to Cash Collateral and Incur the DIP Facility Would Cause Immediate and Irreparable Harm.

62.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to

obtain credit pursuant to section 364 of the Bankruptcy Code or to use Cash Collateral pursuant to

section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service

of such motion.   Upon request, however, the Bankruptcy Court may conduct a preliminary,

expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to

the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

63.     For the reasons noted above, the Debtors have an immediate postpetition need to

use Cash Collateral and access the liquidity provided by the DIP Facility to continue operations,

preserve and maximize the value of their estates, and administer the Cases.   The Debtors require

immediate access to liquidity in order to satisfy the day-to-day financing needs of their business

operations.   This access will permit the orderly continuation of the operation of their business,

maintain business relationships with their vendors and suppliers, pay wages and benefits, and

satisfy other essential working capital and operational needs, all of which are required to preserve

and maintain the Debtors' going concern value for the benefit of all parties in interest.

64.     The Debtors believe that substantially all of their available cash constitutes the

Prepetition Secured Parties' Cash Collateral.   The Debtors will therefore be unable to proceed with

their proposed restructuring, operate their business in the near term, or otherwise fund the Cases

without access to Cash Collateral, and will suffer immediate and irreparable harm to the detriment

of all creditors and other parties in interest, including the Prepetition Secured Parties.   In short, the

Debtors' ability to finance their operations and the availability of sufficient working capital and liquidity to the Debtors through the use of Cash Collateral is vital to preserve and maximize the value of the Debtors' estates.

65.     The Debtors, therefore, seek immediate authority to use the Cash Collateral and incur the DIP Facility, as set forth in this Motion and in the Interim Order, to prevent immediate and irreparable harm to their estates pending the Final Hearing pursuant to Bankruptcy Rule 4001(b). Accordingly, the Debtors respectfully submit that they have satisfied the requirements of Bankruptcy Rule 4001 to support an expedited preliminary hearing and immediate Cash Collateral availability on an interim basis.

## IX.     The Automatic Stay Should Be Modified on a Limited Basis.

66.     The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders and the Sponsors to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim Order. The proposed Interim Order further provides that the automatic stay is modified as necessary to, among other things, permit the Debtors to grant liens as reasonably requested by the DIP Agent or the Prepetition Administrative Agent (each at the direction of the applicable required lenders or the Sponsors) and incur all liabilities and obligations set forth in the Interim Order. The proposed Interim Order also provides that, immediately upon the occurrence and during the continuation of an Event of Default (as defined in the DIP Credit Agreement), the automatic stay shall be modified so that five (5) business days after the date on which a Termination Declaration (as defined in the Interim Order) is delivered, the DIP Agent (at the direction of the Required DIP Lenders and the Sponsors) shall be entitled to exercise all rights and remedies in accordance with the DIP Documents and the Interim Order to satisfy the DIP

Obligations, DIP Superpriority Claims and DIP Liens (each as defined in the Interim Order), in each case subject to the Carve Out.

67.    In addition, with respect to the Prepetition Secured Parties, the Interim Order permits the Debtors to (a) grant the Adequate Protection Liens and the DIP Superpriority Claim, (b) perform such acts as the Prepetition Administrative Agent may request in its reasonable discretion to assure the perfection and priority of the liens granted herein, (c) incur all liabilities and obligations to the Prepetition Administrative Agent and the Prepetition Secured Parties under the Interim Order, and (d) subject to the Carve Out, make, and the Prepetition Agent and the Prepetition Lenders to retain and apply, payments made in accordance with the terms of the Interim Order.   The Interim Order provides that five (5) business days after the date on which a Termination Declaration is delivered, the applicable Prepetition Lenders shall be entitled to exercise their rights and remedies to the extent available in accordance with the applicable Prepetition Loan Documents and the Interim Order with respect to the Debtors' use of Cash Collateral.

68.    The Interim Order further provides that upon expiration of the Remedies Notice Period (as defined in the Interim Order), the DIP Agent (at the direction of the Required DIP Lenders and the Sponsors) and the Prepetition Lenders shall be entitled to exercise all remedies set forth in the Interim Order, and in the DIP Documents, and as otherwise available at law without further order or application or motion to the Bankruptcy Court; provided that the Prepetition Lenders shall be permitted to exercise remedies to the extent available solely with respect to the Debtors' use of Cash Collateral.

69.    Stay modifications of this kind are ordinary and standard features of debtor in possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair

under the circumstances of the Cases.  *See, e.g.*, *In re Aegean Marine Petroleum Network Inc.*, Case No. 18-13374 (MEW) (Bankr. S.D.N.Y. Jan. 15, 2019) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Deluxe Entm't Servs. Grp. Inc.*, No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 4, 2019) (same); *In re Sungard Availability Serv's Capital, Inc.*, No. 19-22915 (RDD) (Bankr. S.D.N.Y. May 1, 2019) (same); *In re Nine West Holdings, Inc.*, No. 18-10947 (SCC) (Bankr. S.D.N.Y. April 4, 2018) (same); *In re BCBG Max Azria Global Holdings, LLC*, No. 17-10466 (Bankr. S.D.N.Y. March 28, 2017) (same).

## Request for Final Hearing

70.     Pursuant to Bankruptcy Rule 4001(b)(2) and Local Rule 4001-2(c), the Debtors request that the Bankruptcy Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## Reservation of Rights

71.     Nothing contained in the Motion or any actions taken by the Debtors pursuant to relief granted in the Interim Order and Final Order is intended or should be construed as:  (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' or any other party-in-interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' or any other party-in-interest's rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, it being understood that the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek

avoidance, of all such liens.  If the Bankruptcy Court grants the relief sought herein, any payment made pursuant to the Bankruptcy Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

### Waiver of Bankruptcy Rules 6004(a), 6004(h), and 4001(a)(3)

72.     To implement the foregoing successfully, the Debtors request that the Bankruptcy Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Notice

73.     The Debtors will provide notice of this Motion to:  (a) the United States Trustee for the Southern District of New York, Attn: Benjamin J. Higgins; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the administrative agent under the Debtors' prepetition credit agreement, Latham and Watkins, LLP, 885 Third Avenue, New York, NY 10022, Attn: Adam J. Goldberg and Hugh Murtagh; (d) counsel to the Sponsors, Cravath, Swaine & Moore LLP, Worldwide Plaza, 825 Eighth Avenue, New York, NY 10019, Attn: Paul H. Zumbro and George E. Zobitz, and Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017, Attn: Michael H. Torkin; (e) counsel to the ad hoc group of Consenting Lenders, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166, Attn: Scott J. Greenberg, Steven A. Domanowski and Jeremy Evans; (f) the United States Attorney's Office for the Southern District of New York; (g) the Internal Revenue Service; (h) the United States Securities and Exchange Commission; (i) the office of the attorney general in the states where the Debtors conduct their business operations; and (j) any party that has requested

notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the

relief requested, no other or further notice need be given.

## **No Prior Request**

74.    No prior request for the relief sought in this Motion has been made to this or any

other court.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request entry of an interim order, substantially in the form attached hereto as **Exhibit A** (a) granting the relief requested herein and (b) granting such other relief as is just and proper.

Dated:  July 22, 2020
New York, New York

/s/ Nicole L. Greenblatt
Nicole L. Greenblatt, P.C.
Susan D. Golden
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

Whitney Fogelberg (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

**<u>EXHIBIT A</u>**

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LAKELAND TOURS, LLC, *et al.*,[1] | ) | Case No. 20-11647 (JLG) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**INTERIM ORDER  (I) AUTHORIZING THE DEBTORS
(A) TO OBTAIN POSTPETITION FINANCING AND (B) TO UTILIZE
CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO
PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY,
(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") in the above captioned chapter 11 cases (collectively, the "Cases")

for entry of an interim order (this "Interim Order"), pursuant to sections 105, 361, 362, 363,

364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 506, 507, and 552 of title 11 of the United States

Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 4001-2, 9006-1, 9013-1,

9014-1, and 9014-2 of the local bankruptcy rules for the Southern District of New York (the "Local

Rules"), seeking entry of this interim order (this "Interim Order"):

(i)       authorizing Lakeland Tours, LLC, in its capacity as borrower

(the "Borrower"), to obtain postpetition financing (the "DIP Facility") and for each of the other

Debtors to (a) guarantee unconditionally (the "Guarantors"), on a joint and several basis, the

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/WorldStrides.  The location of the Debtors' service address in these chapter 11 cases is: 49 West 45th Street, New York, NY 10036.

[2]    Capitalized terms used but not defined herein have the meanings given to such terms in the Motion, the DIP Credit Agreement (as defined below), or the Plan, as applicable.

Borrower's obligation in connection with the DIP Facility, consisting of a superpriority senior secured term loan credit facility in the aggregate amount of up to $367.8 million (the "DIP Loans"), comprised of (i) $108 million (inclusive of fees) of new money provided by the DIP Lenders (as defined below) (the "Lender DIP Loans"), (ii) $108 million (inclusive of fees) of new money provided by the Sponsors (the "Sponsor DIP Loans"), (iii) a roll up of $150 million in outstanding Prepetition Loans (as defined below) (the "DIP Roll Up Loans"), and (iv) the roll-over of up to $1.8 million of Existing Letters of Credit; and (b) to secure the Credit Agreement Hedging Obligations (as defined in the RSA) on a postpetition basis, in accordance with the terms and conditions set forth in the DIP Credit Agreement (as defined below), attached hereto as **Exhibit 2**, and all other terms and conditions of the DIP Documents (as defined below) upon entry of the Interim Order, and subject to the terms of the Final Order;

(ii)      authorizing the Debtors to enter into that certain Senior Secured Super-Priority Debtor-in-Possession Term Loan Agreement dated as of July [•], 2020, among the Borrower, the other Loan Parties thereto, the Lenders party thereto (collectively in such capacities, the "DIP Lenders"), and the other parties party thereto, Goldman Sachs Bank USA, as administrative agent and collateral agent (in such capacities, the "DIP Agent," and, together with the DIP Lenders and the Sponsors, solely in their capacity as DIP Lenders, the "DIP Secured Parties") (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time, the "DIP Credit Agreement"); and together with this Interim Order, the Final Order, and all agreements, documents, and instruments delivered or executed in connection therewith (including the fee letters executed by the Borrower in connection with the DIP Facility (including the DIP Agent fee letter)), and other guarantee and security documentation, collectively,

2

the "DIP Documents"), and to perform such other and further acts as may be required in connection with the DIP Documents;

(iii)    authorizing the Debtors to use the DIP Loans (as defined in the DIP Credit Agreement), the proceeds thereof, and the Prepetition Collateral (as defined below), including Cash Collateral (as defined below), in accordance with the Approved Budget (as defined below and subject to permitted variances set forth herein and in the DIP Credit Agreement), which shall be in form and substance acceptable to the Required DIP Lenders and the Sponsors, to provide working capital for, and for other general corporate purposes of, the Debtors, including for payment of any Adequate Protection Payments (as defined below) and reasonable and documented transaction costs, fees, and expenses incurred in connection with the restructuring to be implemented through the Cases;

(iv)    granting adequate protection to the Prepetition Secured Parties (as defined below) to the extent of any Diminution in Value (as defined below) of their interests in the Prepetition Collateral (as defined below);

(v)    granting valid, enforceable, binding, non-avoidable, and fully perfected first priority priming liens on and senior security interests in substantially all of the property, assets, and other interests in property and assets of the Debtors to the DIP Agent for the benefit of the DIP Lenders and the Sponsors (other than the Excluded Assets (as defined in the DIP Credit Agreement)), whether such property is presently owned or after-acquired, and each Debtor's "estate" as created by section 541 of the Bankruptcy Code, of any kind or nature whatsoever, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date (as defined below), subject only to the (x) Carve Out (as defined below), (y) Permitted Liens (as defined in the DIP Credit Agreement) and (z) other

3

valid and unavoidable liens perfected prior to the Petition Date (or perfected after the Petition Date
to the extent permitted by section 546(b) of the Bankruptcy Code) on the terms and conditions set
forth herein and in the DIP Documents;

(vi)     granting superpriority administrative expense claims against each of the
Debtors' estates to the DIP Secured Parties with respect to the DIP Obligations (as defined below)
over any and all administrative expenses of any kind or nature subject and subordinate only to the
payment of the Carve Out on the terms and conditions set forth herein and in the DIP Documents;

(vii)    subject only to entry of a Final Order and the extent set forth herein, waiving
certain of the Debtors' and the estates' right to surcharge against the Prepetition Collateral (as
defined below) pursuant to section 506(c) of the Bankruptcy Code;

(viii)   subject only to entry of a Final Order and the extent set forth herein,
providing that the "equities of the case" exception under Bankruptcy Code section 552(b) shall not
apply to the Prepetition Secured Parties or the DIP Secured Parties with respect to the proceeds,
products, offspring, or profits of any of the Prepetition Collateral or the DIP Collateral, as
applicable;

(ix)     pursuant to Bankruptcy Rule 4001, holding an interim hearing
(the "Interim Hearing") on the Motion before this Bankruptcy Court (as defined below) to consider
entry of this Interim Order, among other things, (1) authorizing Debtors to, on an interim basis,
borrow from the DIP Lenders and the Sponsors a principal amount of up to $367.8 million in DIP
Loans, (2) authorizing the Guarantors to guaranty the DIP Obligations, (3) authorizing the Debtors'
use of Prepetition Collateral (including Cash Collateral), (4) granting the adequate protection
described in this Interim Order, and (5) authorizing the Debtors to execute and deliver the DIP

4

Documents and to perform their respective obligations thereunder and such other and further acts as may be necessary or appropriate in connection therewith;

(x)     scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion and the entry of a final order (the "Final Order"), and approving the form of notice with respect to the Final Hearing; and

(xi)     granting related relief.

This Bankruptcy Court having considered the Motion, the exhibits thereto, the *Declaration of Kellie Goldstein, (I) in Support of Chapter 11 Petitions and First Day Pleadings and (II) Pursuant to Local Rule 1007-2* (the "First Day Declaration"), the *Declaration of Stephen Spencer in Support of the Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Spencer Declaration"), and the other evidence submitted or adduced and the arguments of counsel made at the Interim Hearing held pursuant to Bankruptcy Rule 4001(b)(2) on July 23, 2020; and this Bankruptcy Court having heard and resolved or overruled any objections, reservations of rights, or other statements with respect to the relief requested in the Motion; and the Bankruptcy Court having noted the appearances of all parties in interest; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, and creditors; and the Debtors having provided notice of the Motion as set forth in the Motion, and it appearing that no other or further notice of the Motion need be given; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE BANKRUPTCY COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW**:[4]

A.     *Petition Date*.  On July 20, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") commencing these Cases.

B.     *Debtors in Possession*.  The Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Cases.

C.     *Jurisdiction and Venue*.  The Bankruptcy Court has jurisdiction over the Motion, these Cases, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Venue for these Cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This Bankruptcy Court may enter a final order consistent with Article III of the United States Constitution.  This is a core proceeding under 28 U.S.C. § 157(b) that this Bankruptcy Court may decide a final order consistent with Article III of the United States Constitution (although this is an Interim Order).

D.     *Committee*.  As of the date hereof, no official committee of unsecured creditors has been appointed in these Cases pursuant to section 1102 of the Bankruptcy Code (any such committee subsequently appointed, the "Committee").

E.     *Debtors' Stipulations*.  Subject only to the limitations contained in Paragraphs 18 and 27 herein, the Debtors stipulate and agree that (collectively, Paragraphs E(i) through (v) below are referred to herein as the "Debtors' Stipulations"):

---

[4]     Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

6

(i)      *Prepetition Loans*.

(a)      Under that certain Credit Agreement dated as of December 15, 2017, by and among Lakeland Finance, LLC, as Holdings, Lakeland Tours, LLC, as Successor Borrower (the "Borrower"), certain of the Debtors (the "Guarantors"), the term lenders and revolving lenders party thereto (collectively, the "Prepetition Lenders"), the other parties party thereto, Goldman Sachs Bank USA, as administrative agent (the "Prepetition Administrative Agent", and together with the Prepetition Lenders, the "Prepetition Secured Parties"), and BNP Paribas Securities Corp., as syndication agent (such credit agreement, as amended, restated, supplemented, waived or otherwise modified from time to time, the "Prepetition Credit Agreement", and together with the other "Loan Documents" (as defined in the Prepetition Credit Agreement, the "Prepetition Loan Documents"), the Prepetition Lenders provided term loans in an aggregate principal amount of $560 million (comprised of $425 million of initial term loans, a delayed draw of $35 million, and two separate incremental term loan facilities of $85 million and $50 million, respectively), and revolving commitments of $60 million (the "Prepetition Loans").

(b)      As of the Petition Date, the Debtors were jointly and severally indebted to the Prepetition Secured Parties pursuant to the Prepetition Loan Documents, without defense, counterclaim, or offset of any kind, in the aggregate principal amount of $642 million *plus* accrued and unpaid interest with respect thereto and any additional fees, costs, expenses (including any attorneys', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing, and all other Obligations (as defined in the Prepetition Credit Agreement) owing under or in connection with the Prepetition Loan Documents (collectively, the "Prepetition Obligations").

(ii)    *Prepetition Collateral*.    In connection with the Prepetition Credit Agreement, the Debtors entered into that certain Pledge and Security Agreement, dated as of December 15, 2017 (as amended, supplemented or otherwise modified from time to time, the "Security Agreement"), by and between Lakeland Finance, LLC, as Holdings, WS Holdings Acquisition, Inc., as Initial Borrower, Lakeland Tours, LLC, as Successor Borrower, the other Loan Parties listed on the signature pages thereto, and the Prepetition Administrative Agent. Pursuant to the Security Agreement and the other Prepetition Loan Documents, the Prepetition Obligations are secured by valid, binding, perfected first priority security interests in and liens (the "Prepetition Liens") on the "Collateral" (the "Prepetition Collateral"), as defined in the Security Agreement, consisting of substantially all of the Debtors' assets, except as may be set forth in the Security Agreement.

(iii)    *Cash Collateral*.    Any and all of the Debtors' cash, including the Debtors' cash and other amounts on deposit or maintained in any account or accounts by the Debtors, and any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral existing as of the Petition Date, and the proceeds of any of the foregoing is the Prepetition Secured Parties' cash collateral within the meaning of Bankruptcy Code section 363(a) (the "Cash Collateral").

(iv)    *Bank Accounts*.    As of the Petition Date, none of the Debtors has either opened or maintains any bank accounts other than the accounts listed in the exhibit attached to any order authorizing the Debtors to continue to use the Debtors' existing cash management system (the "Cash Management Order").

(v)    *Validity, Perfection, and Priority of Prepetition Liens and Prepetition Obligations*.    (A) As of the Petition Date, the Prepetition Liens are valid, binding, enforceable,

8

non-avoidable, and properly perfected liens on and security interests in the Prepetition Collateral; (B) as of the Petition Date, the Prepetition Liens are subject and/or subordinate only to valid, perfected, and unavoidable liens and security interests existing as of the Petition Date that are senior in priority to the Prepetition Liens as permitted by the terms of the Prepetition Loan Documents; (C) the Prepetition Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors; (D) no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Obligations exist, and no portion of the Prepetition Liens or Prepetition Obligations is subject to any challenge or defense including impairment, set-off, right of recoupment, avoidance, attachment, disallowance, disgorgement, reduction, recharacterization, recovery, subordination (whether equitable or otherwise), attack, offset, defense, counterclaims, cross-claims, or "claim" (as defined in the Bankruptcy Code), pursuant to the Bankruptcy Code or applicable nonbankruptcy law; and (E) the Debtors and their estates have no claims, objections, challenges, causes of actions, recoupments, counterclaims, cross-claims, setoff rights, and/or choses in action, including "lender liability" causes of action or avoidance claims under chapter 5 of the Bankruptcy Code, whether arising under applicable state law or federal law (including any recharacterization, subordination, avoidance, disgorgement, recovery, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), against the Prepetition Administrative Agent, the Prepetition Secured Parties, or any of their respective affiliates, agents, representatives, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon, or related to their loans under the Prepetition Loan Documents, the Prepetition Obligations, or the Prepetition Liens.

F.      _Findings Regarding the DIP Facility and Use of Cash Collateral_.

(i)      The Debtors have an immediate need to obtain the DIP Facility and to use Cash Collateral (solely to the extent consistent with the Approved Budget (subject to permitted variances as set forth in this Interim Order and the DIP Documents)) to, among other things, (A) permit the orderly continuation of their businesses; (B) pay certain Adequate Protection Payments; and (C) pay the costs of administration of their estates and satisfy other working capital and general corporate purposes of the Debtors.  Specifically, the proceeds of the DIP Loans will provide the Debtors with the ability to fund day-to-day operations and meet administrative obligations during the Cases.  The DIP Facility will also reassure the Debtors' customers and employees that the Debtors will have access to additional liquidity to meet its commitments during the Cases and that the Debtors' businesses are likely to continue as a going concern post-emergence.  The ability of the Debtors to obtain sufficient working capital and liquidity through the incurrence of the new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the Debtors' going concern values and successful reorganization.  The Debtors will not have sufficient sources of working capital and financing to operate their businesses in the ordinary course of business throughout the Cases without access to the DIP Facility and authorized use of Cash Collateral.

(ii)      The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders and the Sponsors under the DIP Documents and are unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense.  The Debtors also are unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the DIP Documents without the Debtors granting to the DIP Secured Parties, subject to the Carve Out as provided for

10

herein, the DIP Liens (as defined below) and the DIP Superpriority Claims (as defined below) under the terms and conditions set forth in this Interim Order and the DIP Documents.

(iii)    The DIP Facility has been negotiated in good faith and at arm's length among the Debtors and the DIP Secured Parties, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility and the DIP Documents including, without limitation, all loans made to and guarantees issued by the Debtors pursuant to the DIP Documents and all other obligations under the DIP Documents (collectively, the "DIP Obligations") shall be deemed to have been extended by the DIP Secured Parties in good faith as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code.  The DIP Obligations, the DIP Liens, and the DIP Superpriority Claims shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, and any liens or claims granted to, or payments made to, the DIP Agent, the DIP Lenders or the Sponsors hereunder arising prior to the effective date of any such vacatur, reversal, or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

(iv)    *Roll Up Loans*.  On a final basis, upon entry of this Interim Order, without any further action by the Debtors or any other party, $150 million of the Prepetition Loans shall be converted into the DIP Roll Up Loans.  Such conversion (or "roll-up") shall be authorized as compensation for, in consideration for, and solely on account of, the agreement of the Prepetition Lenders that are also DIP Lenders (or affiliates thereof) to fund the Lender DIP Loans and not as payments under, adequate protection for, or otherwise on account of, any Prepetition Obligations.

11

The Prepetition Secured Parties would not otherwise consent to the use of their Cash Collateral or the subordination of their liens to the DIP Liens, and the DIP Lenders would not be willing to provide the Lender DIP Loans or extend credit to the Debtors thereunder without the inclusion of the DIP Roll Up Loans in the DIP Obligations.  Notwithstanding the foregoing, nothing in this Interim Order shall impact the ability for the Bankruptcy Court to unwind or partially unwind, after notice and a hearing, the incurrence of the DIP Roll Up Loans, in the event there is a timely and successful Challenge (as defined below) to the validity, enforceability, extent, perfection or priority of the Prepetition Secured Parties' liens or claims, or a determination that the Obligations under the Prepetition Credit Agreement were undersecured as of the Petition Date, or that the roll-up of Obligations under the Prepetition Credit Agreement unduly advantaged the Prepetition Lenders.

(v)    *Sections 506(c) and 552(b)*.  In light of the Prepetition Secured Parties' agreement to subordinate their liens and superpriority claims to the DIP Obligations and the Carve Out (as defined herein) and to permit the use of their Cash Collateral as set forth herein, the Prepetition Secured Parties are entitled to the rights and benefits of section 552(b) of the Bankruptcy Code and, subject only to and upon entry of the Final Order, (i) a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code and (ii) a waiver of the provisions of section 506(c) of the Bankruptcy Code.

(vi)    *Consent by Prepetition Administrative Agent*.    The Prepetition Administrative Agent (at the direction of the applicable required lenders as set forth in the Prepetition Credit Agreement), on behalf and for the benefit of each of the Prepetition Secured Parties, has consented to, conditioned on the entry of this Interim Order, the Debtors' incurrence of the DIP Facility and proposed use of Cash Collateral on the terms and conditions set forth in

12

this Interim Order, and the terms of the adequate protection provided for in this Interim Order, including that the Adequate Protection Liens and Adequate Protection Superpriority Claim are subject and subordinate to the Carve Out.

G.      *Good Cause Shown; Best Interest*.  Good cause has been shown for entry of this Interim Order, and entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing businesses and enhance the Debtors' prospects for a successful reorganization.  Absent granting the relief sought by this Interim Order, the Debtors' estates will be immediately and irreparably harmed.

H.      *Notice*.  In accordance with Bankruptcy Rules 2002, 4001(b) and (c), and 9014, and the applicable Local Rules, notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors.  Under the circumstances, the notice given by the Debtors of the Motion, the relief requested herein, and of the Interim Hearing complies with Bankruptcy Rules 2002, 4001(b) and (c), and 9014 and applicable Local Rules.

Based upon the foregoing findings and conclusions, the Motion and the record before the Bankruptcy Court with respect to the Motion, and good and sufficient cause appearing therefor, IT IS HEREBY ORDERED THAT:

1.      <u>DIP Financing Approved</u>.  The Motion is granted on an interim basis as set forth herein, and the use of Cash Collateral on an interim basis is authorized, subject to the terms of this Interim Order.

2.      <u>Objections Overruled</u>.  Any objections, reservations of rights, or other statements with respect to entry of the Interim Order, to the extent not withdrawn or resolved, are hereby

denied and overruled on the merits.  This Interim Order shall become effective immediately upon its entry.

3.      <u>Authorization of the DIP Facility and the DIP Documents</u>.

(a)      The Debtors are hereby immediately authorized and empowered to enter into, and execute and deliver, the DIP Documents, and such additional documents, instruments, certificates and agreements as may be reasonably required or requested by the DIP Secured Parties to implement the terms or effectuate the purposes of this Interim Order and the DIP Documents. To the extent not entered into as of the date hereof, the Debtors and the DIP Secured Parties shall negotiate the DIP Documents in good faith, and in all respects such DIP Documents shall be consistent with the terms of the DIP Credit Agreement and otherwise acceptable to the DIP Agent, the Required DIP Lenders (as defined in the Restructuring Term Sheet), and the Sponsors.  Upon entry of this Interim Order and until execution and delivery of the DIP Credit Agreement and other DIP Documents required or requested by the DIP Secured Parties, (x) the Debtors and the DIP Secured Parties shall be bound by the terms and conditions and other provisions set forth in the other executed DIP Documents (including the fee letters executed in connection with the DIP Facility), with the same force and effect as if duly executed and delivered to the DIP Agent by the Debtors, and (y) this Interim Order and the other executed DIP Documents (including the fee letters executed in connection with the DIP Facility) shall govern and control the DIP Facility.    Upon entry of this Interim Order, the Interim Order, the DIP Credit Agreement, and other DIP Documents shall govern and control the DIP Facility.  The DIP Agent is hereby authorized to execute and enter into its respective obligations under the DIP Documents, subject to the terms and conditions set forth therein and this Interim Order.  Upon execution and delivery thereof, the DIP Documents shall constitute valid and binding obligations of the Debtors enforceable in

14

accordance with their terms.  To the extent there exists any conflict among the terms and conditions of the Motion, the DIP Documents, and this Interim Order, the terms and conditions of this Interim Order shall govern and control.  To the extent there is a conflict between the terms and conditions of the Motion and the DIP Documents, the terms and conditions of the DIP Documents shall govern and control.

(b)    Upon entry of this Interim Order, the Borrower is hereby authorized to borrow, and the Guarantors are hereby authorized to guaranty, borrowings up to an aggregate principal amount of $216 million in DIP Loans, subject to and in accordance with this Interim Order, and (ii) on a final basis upon entry of this Interim Order, incur the DIP Roll Up Loans and, without any further action by the Debtors or any other party, and as a condition to providing the DIP Loans, the DIP Roll Up Loans shall be included in the DIP Obligations.

(c)    In accordance with the terms of this Interim Order and the DIP Documents, proceeds of the DIP Loans shall be used solely for the purposes permitted under the DIP Documents and this Interim Order, and in accordance with the Approved Budget, subject to permitted variances as set forth in this Interim Order and the DIP Documents.  Attached as **Exhibit 1** hereto and incorporated herein by reference is a budget prepared by the Debtors and approved by the Required DIP Lenders and the Sponsors in accordance with Section 5.17 of the DIP Credit Agreement (the "Approved Budget").

(d)    In furtherance of the foregoing and without further approval of this Bankruptcy Court, each Debtor is authorized, and the automatic stay imposed by section 362 of the Bankruptcy Code is hereby lifted to the extent necessary to perform all acts and to make, execute, and deliver all instruments and documents (including, without limitation, the DIP Credit Agreement, any security and pledge agreement, and any mortgage to the extent contemplated

thereby, or the DIP Credit Agreement), and to pay all fees (including all amounts owed to the DIP

Lenders, the Sponsors, and the DIP Agent under the DIP Documents), in each case as they may be

reasonably required or necessary for the Debtors' performance of their obligations under the DIP

Facility including, without limitation:

(1)     the execution, delivery, and performance of the DIP Documents, including,

without limitation, the DIP Credit Agreement, any security and pledge

agreement, and any mortgage to the extent contemplated thereby;

(2)     the execution, delivery, and performance of one or more amendments,

waivers, consents, or other modifications to and under the DIP Documents

(in each case in accordance with the terms of the applicable DIP Documents

and in such form as the Debtors, the DIP Agent, the Required DIP Lenders,

and the Sponsors may agree), it being understood that no further approval

of the Bankruptcy Court shall be required for amendments, waivers,

consents, or other modifications to and under the DIP Documents or the DIP

Obligations that do not shorten the maturity of the extensions of credit

thereunder or modify the commitments or the rate of interest or other

amounts payable thereunder;

(3)     the non-refundable payment to each of and/or on behalf of the DIP Secured

Parties, as applicable, of the fees referred to in the DIP Documents,

including (x) all fees and other amounts owed to the DIP Agent, the DIP

Lenders, and the Sponsors and (y) all reasonable and documented costs and

expenses as may be due from time to time, including, without limitation,

the reasonable and documented fees and expenses of counsel and other

16

professionals retained as provided for in the DIP Documents and this Interim Order (whether incurred before or after the Petition Date), including, for the avoidance of doubt, (a) Gibson, Dunn & Crutcher ("Gibson") (as counsel), Rothschild & Co. ("Rothschild") (as financial advisor) to the DIP Lenders and the Prepetition Lenders; (b) Latham & Watkins LLP ("Latham"), as counsel to the DIP Agent, Prepetition Administrative Agent and Consenting Hedge Provider (as defined in the RSA), and, solely to the extent necessary to exercise its rights and fulfill its obligations under the DIP Documents, one counsel to the DIP Agent in each local jurisdiction; and (c) Cravath, Swaine & Moore LLP ("Cravath") (as counsel), Simpson Thatcher & Bartlett LLP ("Simpson") (as counsel), and PJT Partners ("PJT") (as financial advisor) to the Sponsors, which such fees and expenses shall not be subject to the approval of the Bankruptcy Court, nor shall any recipient of any such payment be required to file with respect thereto any interim or final fee application with the Bankruptcy Court provided that any fees and expenses of a professional shall be subject to the provisions of Paragraph 18 of this Interim Order; and

(4)    the performance of all other acts required under or in connection with the DIP Documents.

(e)    Upon entry of this Interim Order, such DIP Documents, the DIP Obligations, and the DIP Liens shall constitute valid, binding, and non-avoidable obligations of the Debtors enforceable against each Debtor party thereto in accordance with their respective terms and the terms of this Interim Order for all purposes during the Cases, any subsequently converted

17

Case of any Debtor to a case under chapter 7 of the Bankruptcy Code or after the dismissal of any

Case.  Upon entry of this Interim Order, all letters of credit issued for the account of the Debtors

under the Prepetition Credit Agreement shall continue in place and all obligations under or in

connection with such letters of credit shall be subject to the DIP Credit Agreement and shall

constitute DIP Obligations.  Upon entry of this Interim Order, all Existing Hedges (which are the

"Secured Hedging Obligations" under the Prepetition Credit Agreement) shall constitute DIP

Obligations ranking *pari passu* with the obligations under the DIP Facility.  No obligation,

payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Documents,

or this Interim Order shall be stayed, restrained, voidable, avoidable, or recoverable under the

Bankruptcy Code or under any applicable law (including without limitation, under sections 502(d),

548, or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer

Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any

defense, reduction, setoff, recoupment, or counterclaim.  All payments or proceeds remitted (a) to

or on behalf of the DIP Agent on behalf of any DIP Secured Parties or (b) to or on behalf of the

Prepetition Secured Parties, in each case pursuant to the DIP Documents, the provisions of this

Interim Order, or any subsequent order of this Bankruptcy Court, shall be received free and clear

of any claim, charge, assessment, or other liability, including, without limitation, any such claim

or charge arising out of or based on, directly or indirectly, section 506(c) or the "equities of the

case" exception of section 552(b) of the Bankruptcy Code (and, solely in the case of waivers of

rights under sections 506(c) and 552(b) of the Bankruptcy Code, subject only to the entry of the

Final Order).

(f)     On a final basis, upon entry of this Interim Order, the Debtors are authorized

to take such acts as shall be necessary or desirable in order to effect the roll-up and conversion of

18

$150 million of Prepetition Loans beneficially owned by the applicable DIP Lenders as of 5:00 p.m. Eastern Time on the date of entry of the Interim Order into DIP Roll Up Loans.

(g)    The Guarantors hereby are authorized and directed to jointly, severally, and unconditionally guarantee, and upon entry of this Interim Order shall be deemed to have guaranteed, in full, all of the DIP Obligations of the Borrower.

4.    <u>Budget and Variance Reporting</u>.    On the final business day of every fourth consecutive calendar week following entry of this Interim Order beginning with the first full week following the Petition Date, the Borrower must provide the DIP Agent, counsel to the DIP Lenders, and counsel to the Sponsors with an updated Approved Budget for the subsequent 13-week period. The Borrower may elect to update, modify or supplement the budget from time to time; provided that any such update, modification or supplement thereto shall not be deemed to constitute the "Approved Budget" without the acceptance of each of the Required DIP Lenders and the Sponsors (which acceptance may be communicated by (i) Rothschild (as financial advisor to the DIP Lenders) or Gibson (as legal counsel to the DIP Lenders), and (ii) PJT (as financial advisor to the Sponsors) or Cravath (as counsel to the Sponsors) and Simpson (as counsel to the Sponsors), to counsel for the Debtors via email).  For the avoidance of doubt, the initial Approved Budget or any subsequent Approved Budget shall be deemed to constitute the "Approved Budget" for purposes of this Interim Order with the most recently delivered budget constituting the "Approved Budget," only upon acceptance by the Required DIP Lenders and the Sponsors (which acceptance may be communicated by (i) Rothschild (as financial advisor to the DIP Lenders) or Gibson (as legal counsel to the DIP Lenders), and (ii) PJT (as financial advisor to the Sponsors) or Cravath (as counsel to the Sponsors) and Simpson (as counsel to the Sponsors), to counsel for the Debtors via email).  In the event that the Required DIP Lenders and the Sponsors, on the one hand, and the

19

Debtors, on the other hand, cannot agree as to a new Approved Budget, the prior Approved Budget

shall remain in full force and effect unless and until a new Approved Budget is approved by the

Required DIP Lenders and the Sponsors.  Commencing on August 7, 2020, on or before 5:00 p.m.

(Eastern Standard Time) on Friday of each week, the Debtors shall deliver to the DIP Agent, the

DIP Lenders, and the Sponsors a budget variance report/reconciliation (the "Approved Budget

Variance Report") setting forth in reasonable detail actual cash receipts and disbursements for the

prior week and all variances, in each case on both an individual line item basis and a cumulative

basis, as compared to the then applicable Approved Budget, together with a statement certifying

compliance or non-compliance with the budget covenants set forth in the DIP Credit Agreement.

The Approved Budget Variance Report shall include an indication as to whether each variance is

temporary or permanent, along with an analysis and an explanation for any material variances.

5.      Access to Records.  The Debtors shall provide the advisors to the Prepetition

Secured Parties with all reporting and other information required to be provided to the DIP Agent

under the DIP Documents.  In addition to, and without limiting, whatever rights to access the DIP

Secured Parties have under the DIP Documents, upon reasonable notice to Debtors' counsel (email

being sufficient), at reasonable times during normal business hours, the Debtors shall permit

representatives, agents, and employees of the DIP Secured Parties to have reasonable access to (i)

inspect the Debtors' assets, and (ii) all information (including historical information and the

Debtors' books and records) and personnel, including regularly scheduled meetings as mutually

agreed with senior management of the Debtors and other company advisors (during normal

business hours), it being understood that the DIP Secured Parties shall be provided with access to

all information they shall reasonably request, excluding any information for which confidentiality

is owed to third parties, information subject to attorney-client or similar privilege, or where such disclosure would not be permitted by any applicable requirements of law.

6.      DIP Superpriority Claims.  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors' estates (the "DIP Superpriority Claims") (without the need to file any proof of claim) with priority over any and all administrative expenses, adequate protection claims, diminution claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed claims shall for the purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, without limitation, if authorized in the Final Order, any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code, if any (the "Avoidance Actions"), subject only to, and subordinated in all respects to, the payment of the Carve Out.  Except as set forth in this Interim Order or the Final Order, no other superpriority claims shall be granted or allowed in these Cases.

7.      DIP Liens.  As security for the DIP Obligations, effective and perfected upon the date of this Interim Order, and without the necessity of the execution, recordation of filings by the

Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by the DIP Agent, any DIP Lender, or the Sponsors of, or over, any DIP Collateral (as defined below), the following security interests and liens are hereby granted by the Debtors to the DIP Agent, for the benefit of the DIP Lenders and the Sponsors (all property identified in this Paragraph 7 being collectively referred to as the "DIP Collateral"), subject to (x) the Permitted Liens (as defined in the DIP Credit Agreement) and (y) the Carve Out (all such liens and security interests granted to the DIP Agent, for the benefit of the DIP Lenders and the Sponsors, pursuant to this Interim Order and the DIP Documents, the "DIP Liens"):

(a)     First Priority Lien On Any Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, non-avoidable, automatically, and properly perfected first priority senior security interest in and lien upon all property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected, and non-avoidable liens (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) (subject only to the Carve Out), including, without limitation (in each case, to the extent not subject to valid, perfected, and non-avoidable liens):  (i) a 100% equity pledge of any first-tier foreign subsidiaries; (ii) unencumbered cash of the Debtors (whether maintained with the DIP Agent or otherwise); (iii) the Current Business Interruption Policy and any Future Business Interruption Policy (each as defined in the Restructuring Term Sheet), and any proceeds thereof; and (iv) any investment of such cash, accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds,

22

insurance proceeds, letters of credit, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, any other equity or ownership interests (including equity interests in subsidiaries of each Debtor), money, investment property, intercompany claims, claims arising on account of transfers of value from a Debtor to (x) another Debtor and (y) a non-Debtor affiliate incurred on or following the Petition Date, causes of action, including causes of action arising under section 549 of the Bankruptcy Code (but excluding all other Avoidance Actions), all products and proceeds of the foregoing and, subject to the Final DIP Order, all proceeds and property recovered in respect of all Avoidance Actions; provided that, for the avoidance of doubt and notwithstanding anything to the contrary contained herein, (x) with respect to non-residential leases of real property, unless the applicable lease expressly permits the granting of liens on such lease, the liens granted pursuant to this Interim Order shall attach solely to the proceeds of such lease and not to the subject lease itself and (y) Excluded Assets (as defined in the DIP Credit Agreement) shall not be subject to such Liens (collectively, the "Previously Unencumbered Property").

(b)     Liens Priming the Prepetition Liens.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all property of the Debtors that was subject to the Prepetition Liens (subject to the Carve Out) including, without limitation, the Prepetition Collateral and Cash Collateral; provided that such liens shall be immediately junior to any valid, perfected, and unavoidable liens, if any, existing as of the Petition Date that are senior in priority to the Prepetition Liens of the Prepetition Secured Parties as permitted by the terms of the

23

Prepetition Loan Documents; _provided_, _further_, that, for the avoidance of doubt and notwithstanding anything to the contrary contained herein, (x) with respect to non-residential leases of real property, unless the applicable lease expressly permits the granting of liens on such lease, the liens granted pursuant to this Interim Order shall attach solely to the proceeds of such lease and not to the subject lease itself and (y) Excluded Assets (as defined in the DIP Credit Agreement) shall not be subject to such liens.

8.      _Adequate Protection for the Prepetition Secured Parties_.  Subject only to the Carve Out and the terms of this Interim Order, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), solely for and equal in amount to the aggregate postpetition diminution in value of such interests (each such diminution, a "_Diminution in Value_"), resulting from, among other things, the imposition of the priming DIP Liens on the Prepetition Collateral, the Carve Out, the Debtors' use of the Prepetition Collateral (including Cash Collateral), and the imposition of the automatic stay, the Prepetition Administrative Agent, for the benefit of itself and the other Prepetition Secured Parties, is hereby granted the following (collectively, the "_Adequate Protection Obligations_"):

(a)      _Adequate Protection Liens_.  As security for and solely to the extent of any Diminution in Value, additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens as of the date of this Interim Order (together, the "_Adequate Protection Liens_"), without the necessity of the execution by the Debtors (or recordation or other filing), of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, on all DIP Collateral and, if authorized in the Final Order, all proceeds or property recovered from

24

Avoidance Actions.  Subject to the terms of this Interim Order, the Adequate Protection Liens shall be subordinate only to the (A) Carve Out, (B) the DIP Liens, and (C) other valid, perfected and unavoidable liens, if any, existing as of the Petition Date that are senior in priority to the Prepetition Liens of the Prepetition Secured Parties as permitted by the terms of the Prepetition Loan Documents.  The Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral (including, for the avoidance of doubt, any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code).

(b)    Adequate Protection Superpriority Claims.  As further adequate protection, and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code, allowed administrative expense claims in each of the Cases ahead of and senior to any and all other administrative expense claims in such Cases to the extent of any postpetition Diminution in Value (the "Adequate Protection Superpriority Claims"), but junior to the Carve Out and the DIP Superpriority Claims.  Subject to the Carve Out and the DIP Superpriority Claims in all respects, the Adequate Protection Superpriority Claims will not be junior to any claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (if authorized in the Final Order), 507(a), 507(b), 546(d), 726, 1113 and 1114 of the Bankruptcy Code.  The Prepetition Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Adequate Protection Superpriority Claims under section 507(b) of the Bankruptcy Code granted hereunder unless and until the DIP

Obligations have been indefeasibly paid in full, in cash, or satisfied in a manner otherwise agreed to by the Required DIP Lenders and the Sponsors, in each case as provided in the DIP Documents.

(c)     <u>First Lien Adequate Protection Payments</u>.  As further adequate protection, the Debtors are authorized and directed to pay, in accordance with the terms of Paragraph 18 of this Interim Order, (i) all reasonable and documented fees and expenses (the "<u>Adequate Protection Fees</u>"), whether incurred before or after the Petition Date, including all reasonable and documented fees and expenses of counsel and other professionals retained as provided for in the DIP Documents and this Interim Order, including, for the avoidance of doubt, of (A) Latham as counsel to the DIP Agent, Prepetition Administrative Agent and the Consenting Hedge Provider, (B) Gibson as counsel to the DIP Lenders and Prepetition Lenders, (C) Rothschild as financial advisor to the DIP Lenders and Prepetition Lenders, and (D) solely to the extent necessary to exercise and fulfill its obligations under the Prepetition Loan Documents, one counsel to the Prepetition Administrative Agent in each local jurisdiction, and (ii) non-refundable cash payment of all accrued but unpaid interest under the Prepetition Credit Agreement as such interest becomes due, or, in the event the Effective Date (as defined in the RSA) occurs before the next scheduled interest payment date, the Effective Date (only with respect to interest accrued through such date) (all payments referenced in this sentence, collectively, the "<u>Adequate Protection Payments</u>").  None of the Adequate Protection Fees shall be subject to separate approval by this Bankruptcy Court or the U.S. Trustee Guidelines, and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto or otherwise seek the Bankruptcy Court's approval of any such payments.

(d)     <u>Right to Seek Additional Adequate Protection</u>.  This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the

Prepetition Secured Parties to request further or alternative forms of adequate protection at any time or the rights of the Debtors or any other party to contest such request.

        9.     Carve Out.

        (a)    <u>Priority of Carve Out</u>. Subject to the terms and conditions contained in this Paragraph 9, each of the DIP Liens, DIP Superpriority Claims, Prepetition Liens, Adequate Protection Liens, and Adequate Protection Superpriority Claims shall be subject and subordinate to payment of the Carve Out (as defined below). The Carve Out shall have such priority over all assets of the Debtors, including any DIP Collateral, Prepetition Collateral, and any funds in the escrow account into which the DIP Loans are funded.

        (b)    <u>Definition of Carve Out</u>. As used in this Interim Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iv) below); (ii) all reasonable fees and expenses up to $75,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iv) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and the Committee (if any) pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the DIP Agent (at the direction of the Required DIP Lenders or the Sponsors, in each case pursuant to and in accordance with the DIP Credit Agreement) of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy

Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $2,000,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"). For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, Kirkland & Ellis LLP, as proposed counsel to the Debtors, the U.S. Trustee, and counsel to the Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(c)      Carve Out Reserves.  On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors with a copy to counsel to any Committee appointed in these Cases and the U.S. Trustee (the "Termination Declaration Date"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors for DIP Loans under the DIP Facility (each, as defined in the DIP Credit Agreement) (on a pro rata basis based on the then outstanding DIP Obligations), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute DIP Loans) and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.  On the Termination

28

Declaration Date, the Carve Out Trigger Notice shall also (i) be deemed a request by the Debtors for DIP Loans under the DIP Facility (on a pro rata basis based on the then outstanding DIP Obligations), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP Loans) and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap. The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims. On the first business day after the DIP Agent gives such notice to such DIP Lenders and the Sponsors, notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to the existence of a Default (as defined in the DIP Credit Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for DIP Loans under the DIP Facility, any termination of the DIP Obligations following an Event of Default, or the occurrence of the Maturity Date, each DIP Lender with an outstanding Commitment (on a pro rata basis based on the then outstanding Commitments) shall make available to the DIP Agent such DIP Lender's pro rata share with respect to such borrowing in accordance with the DIP Facility. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders and the Sponsors, unless the DIP

29

Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments (as defined and used in the DIP Credit Agreement) (the "DIP Commitments") have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders and the Sponsors, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date. Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, if either of the Carve -Out Reserves is not funded in full in the amounts set forth in this paragraph 9(c), then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 9(c), prior to making any payments to the DIP Agent, Prepetition Secured Parties, the DIP Lenders or the Sponsors, as applicable. Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Agent, the Prepetition Secured Parties, the DIP Lenders and the Sponsors shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Documents.  Further, notwithstanding anything to the contrary in this Interim Order, (i)

disbursements by the Debtors from the Carve Out Reserves shall not constitute Loans (as defined in the DIP Credit Agreement) or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Approved Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Facility or in any Prepetition Loan Documents, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, and the 507(b) Claim, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Obligations.

(d)      Payment of Allowed Professional Fees Prior to the Termination Declaration Date.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(e)      No Direct Obligation To Pay Allowed Professional Fees.  None of the DIP Agent, DIP Lenders, the Sponsors, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, the Sponsors, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)      Payment of Carve Out On or After the Termination Declaration Date.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date

31

in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

10. <u>Debtors' Reservation of Rights</u>.  The entry of this Interim Order and the grant of adequate protection to the Prepetition Secured Parties pursuant to the terms hereof shall be without prejudice to the rights of the Debtors to, following the occurrence of an Event of Default, seek authority to use the Prepetition Collateral, including Cash Collateral, without the consent of the Prepetition Secured Parties, and the Prepetition Secured Parties reserve all of their respective rights with respect to contesting any such motion or request by the Debtors or any other person.

11. <u>Reservation of Rights of the DIP Agent, DIP Lenders, Prepetition Secured Parties, and the Sponsors</u>.  Subject in all cases to the Carve Out, notwithstanding any other provision in this Interim Order or the DIP Documents to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair:  (a) any of the rights of any of the Prepetition Secured Parties to seek any other or supplemental relief in respect of the Debtors including the right to seek additional adequate protection at and following the Final Hearing; <u>provided</u> that any such further or different adequate protection shall at all times be subordinate and junior to the Carve Out and the claims and liens of the DIP Secured Parties granted under this Interim Order and the DIP Documents; (b) any of the rights of the DIP Secured Parties or the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of any of the DIP Secured Parties or the Prepetition Secured Parties to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases, conversion of any of the Cases to cases under

chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers in any of the Cases, (iii) seek to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Secured Parties or the Prepetition Secured Parties.  The delay in or failure of the DIP Secured Parties and/or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the DIP Secured Parties' or the Prepetition Secured Parties' rights and remedies.

12.     <u>Reservation of Certain Committee and Third Party Rights and Bar of Challenges and Claims</u>.  Subject to the Challenge Period (as defined herein), the stipulations, admissions, waivers, and releases contained in this Interim Order, including the Debtors' Stipulations, shall be binding upon the Debtors, their estates, and any of their respective successors in all circumstances and for all purposes, and the Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined below) as of the Petition Date.  The stipulations, admissions, and waivers contained in this Interim Order, including the Debtors' Stipulations, shall be binding upon all other parties in interest, including the Committee (if appointed) and any other person acting on behalf of the Debtors' estates, unless and to the extent that a party in interest with proper standing granted by order of the Bankruptcy Court (or other court of competent jurisdiction) has timely and properly filed an adversary proceeding or contested matter under the Bankruptcy Rules (i) before the earlier of (a) except as to the Committee (if any), seventy-five (75) calendar days after entry of the Interim Order, and (b) in the case of any such adversary proceeding or contested matter filed by any Committee, sixty (60) calendar days after the appointment of such Committee, subject to further extension by written agreement of the Debtors (in their sole discretion) and the Prepetition Administrative Agent (acting at the direction of the requisite Prepetition Lenders), (in each case,

33

a "Challenge Period" and the date of expiration of each Challenge Period being a "Challenge Period Termination Date"); provided, however, that if, prior to the end of the Challenge Period, (x) the cases convert to chapter 7, or (y) a chapter 11 trustee is appointed, then, in each such case, the Challenge Period shall be extended by the later of (A) the time remaining under the Challenge Period plus ten (10) days or (B) such other time as ordered by the Bankruptcy Court solely with respect to any such trustee, commencing on the occurrence of either of the events discussed in the foregoing clauses (x) and (y); (ii) seeking to avoid, object to, or otherwise challenge the findings or Debtors' Stipulations regarding:  (a) the validity, enforceability, extent, priority, or perfection of the mortgages, security interests, and liens of the Prepetition Administrative Agent and the Prepetition Secured Parties or (b) the validity, enforceability, allowability, priority, secured status, or amount of the Prepetition Obligations (any such claim, a "Challenge"); and (iii) in which the Bankruptcy Court enters a final order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter.  Upon the expiration of the Challenge Period Termination Date without the filing of a Challenge (or if any such Challenge is filed and overruled):  (a) any and all such Challenges by any party (including the Committee (if any), any chapter 11 trustee, and/or any examiner or other estate representative appointed or elected in these Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any Successor Case) shall be deemed to be forever barred; (b) the Prepetition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination, recharacterization, defense, or avoidance for all purposes in the Debtors' Cases and any Successor Cases; (c) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected secured claims, not subject to recharacterization, subordination, or avoidance; and (d) all of the Debtors' stipulations and admissions contained in

this Interim Order, including the Debtors' Stipulations, and all other waivers, releases, affirmations, and other stipulations as to the priority, extent, and validity as to the Prepetition Secured Parties' claims, liens, and interests contained in this Interim Order shall be of full force and effect and forever binding upon the Debtors, the Debtors' estates, and all creditors, interest holders, and other parties in interest in these Cases and any Successor Cases. If any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules and remains pending and the Cases are converted to chapter 7, the chapter 7 trustee may continue to prosecute such adversary proceeding or contested matter on behalf of the Debtors' estates. Furthermore, if any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules, the stipulations and admissions contained in this Interim Order, including the Debtors' Stipulations, shall nonetheless remain binding and preclusive on any Committee and any other person or entity except to the extent that such stipulations and admissions were expressly challenged in such adversary proceeding or contested matter prior to the Challenge Period Termination Date. Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including, without limitation, any Committee appointed in the Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation any challenges (including a Challenge) with respect to the Prepetition Loan Documents, the Prepetition Liens, and the Prepetition Obligations, and a separate order of the Bankruptcy Court conferring such standing on any Committee or other party-in-interest shall be a prerequisite for the prosecution of a Challenge by such Committee or such other party-in-interest.

13.   <u>DIP Termination Date</u>. On the DIP Termination Date (as defined below), (a) all DIP Obligations shall be immediately due and payable; (b) all commitments to extend credit under

the DIP Facility will terminate; (c) all authority to use Cash Collateral shall cease; provided, however, that during the Remedies Notice Period (as defined below), the Debtors may use Cash Collateral to fund the Carve Out and pay payroll and other expenses critical to the administration of the Debtors' estates strictly in accordance with the Approved Budget, subject to such permitted variances set forth herein and in the DIP Documents; and (d) the DIP Secured Parties shall be otherwise entitled to exercise rights and remedies under the DIP Documents in accordance with this Interim Order. For the purposes of this Interim Order, the "DIP Termination Date" shall mean the "Termination Date" as defined in the DIP Credit Agreement.

14.     Events of Default.  The occurrence of the events in either (a) or (b) of this paragraph 14, unless waived by the Required DIP Lenders and the Sponsors in accordance with the terms of the DIP Documents, shall constitute an event of default (collectively, the "Events of Default"): (a) the failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order; or (b) the occurrence of an "Event of Default" under the DIP Credit Agreement.

15.     Rights and Remedies Upon Event of Default.  Immediately upon the occurrence and during the continuation of an Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from the Bankruptcy Court, but subject to the terms of this Interim Order, subject to the Remedies Notice Period (defined below), (a) the DIP Agent (at the direction of the Required DIP Lenders with respect to the Lender DIP Loans and the DIP Roll Up Loans, or the Sponsors with respect to the Sponsor DIP Loans, in each case pursuant to and in accordance with the DIP Credit Agreement) may declare (any such declaration shall be referred to herein as a "Termination Declaration") (i) all DIP Obligations that are Lender DIP Loans and DIP Roll Up Loans, or Sponsor DIP Loans,

as applicable, owing under the DIP Documents to be immediately due and payable, (ii) the

termination, reduction or restriction of any further commitment of the DIP Lenders or the Sponsor,

as applicable, to extend credit to the Debtors to the extent any such commitment remains under

the DIP Facility, (iii) the termination of the DIP Facility and the DIP Documents as to any future

liability or obligation of the DIP Agent, the DIP Lenders, and the Sponsors, as applicable, but

without affecting any of the DIP Liens or the DIP Obligations, and (iv) the application of the Carve

Out through the delivery of the Carve Out Trigger Notice to the Borrower; and (b) subject to

paragraph 13(b), the DIP Agent (at the direction of the Required DIP Lenders) may declare a

termination, reduction or restriction on the ability of the Debtors to use Cash Collateral (the date

which is the earliest to occur of any such date a Termination Declaration is delivered and the DIP

Termination Date shall be referred to herein as the "Termination Date").  The Termination

Declaration shall not be effective until notice has been provided by electronic mail (or other

electronic means) to counsel to the Debtors, counsel to a Committee (if appointed), and the U.S.

Trustee.  The automatic stay in the Cases otherwise applicable to the DIP Agent, the DIP Lenders,

and the Prepetition Secured Parties is hereby modified so that five (5) business days after the date

on which a Termination Declaration is delivered (the "Remedies Notice Period"):  (a) the DIP

Agent (at the direction of the Required DIP Lenders with respect to the Lender DIP Loans and DIP

Roll Up Loans, or the Sponsors, with respect to the Sponsor DIP Loans, in each case pursuant to

and in accordance with the DIP Credit Agreement) shall be entitled to exercise their rights and

remedies in accordance with the DIP Documents and this Interim Order to satisfy the DIP

Obligations, DIP Superpriority Claims, and DIP Liens, in each case subject to the Carve Out, and

(b) the applicable Prepetition Lenders shall be entitled to exercise their rights and remedies to the

extent available in accordance with the applicable Prepetition Loan Documents and this Interim

Order with respect to the Debtors' use of Cash Collateral.  During the Remedies Notice Period, the Debtors, the Committee (if appointed), and/or any party in interest shall be entitled to seek an emergency hearing within the Remedies Notice Period before the Bankruptcy Court.  Unless the Bankruptcy Court has determined that an Event of Default has not occurred and/or is not continuing or the Bankruptcy Court orders otherwise, the automatic stay, as to all of the DIP Agent, DIP Lenders, the Sponsors, and Prepetition Lenders (solely with respect to the use of Cash Collateral to the extent permitted hereunder) shall automatically be terminated at the end of the Remedies Notice Period without further notice or order.  Upon expiration of the Remedies Notice Period, the DIP Agent (at the direction of the Required DIP Lenders with respect to the Lender DIP Loans and DIP Roll Up Loans, or the Sponsors, with respect to the Sponsor DIP Loans, in each case pursuant to and in accordance with  the DIP Credit Agreement) and the Prepetition Lenders shall be permitted to exercise all remedies set forth herein, and in the DIP Documents, and as otherwise available at law without further order of or application or motion to this Bankruptcy Court consistent with this Interim Order; provided, that the Prepetition Lenders shall be permitted to exercise remedies to the extent available solely with respect to the Debtors' use of Cash Collateral.

16.    Limitation on Charging Expenses Against Collateral.  Subject to entry of the Final Order granting such relief, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral or the DIP Collateral (except to the extent of the Carve Out), the DIP Agent, the DIP Lenders, the Sponsors, or the Prepetition Secured Parties pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the DIP Agent, the DIP

Lenders, the Sponsors, and the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, the Sponsors, or the Prepetition Secured Parties.

17.    <u>Use of Cash Collateral</u>.   The Debtors are hereby authorized to use all Cash Collateral of the Prepetition Secured Parties, in a manner consistent with the terms and conditions of this Interim Order and the DIP Documents and in accordance with the Approved Budget (subject to permitted variances as set forth in this Interim Order and the DIP Documents) including, without limitation, for the purpose of making payments on account of the Adequate Protection Obligations provided for in this Interim Order, from the date of this Interim Order through and including the date of termination of the DIP Credit Agreement.  For the avoidance of doubt, the Debtors shall be enjoined and prohibited from using the Cash Collateral except on the terms and conditions of this Interim Order and the DIP Documents and in accordance with the Approved Budget (subject to permitted variances as set forth in this Interim Order and the DIP Documents).

18.    <u>Expenses and Indemnification</u>.

(a)    The Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, the principal, interest, fees, payments, expenses, and other amounts described in the DIP Documents as such amounts become due and without need to obtain further Bankruptcy Court approval, including, without limitation, backstop, closing, arrangement or commitment fees (including all fees and other amounts owed to the DIP Lenders and the Sponsors), administrative agent's fees, collateral agent's fees, and escrow agent's fees (including all fees and other amounts owed to the DIP Agent), the reasonable and documented fees and disbursements of counsel and other professionals to the extent set forth in Paragraphs 3(d)(3) and 8(c) of this Interim Order, whether or not such fees arose before or after the Petition Date, all to the extent provided in this

Interim Order or the DIP Documents.  Notwithstanding the foregoing, the Debtors are authorized and directed to pay on the Closing Date (as defined in the DIP Documents) all reasonable and documented fees, costs, and expenses, including the fees and expenses of counsel to the DIP Lenders, the Sponsors, the DIP Agent, the Prepetition Administrative Agent, the Prepetition Lenders, and the Consenting Hedge Provider, incurred on or prior to such date without the need for any professionals engaged by the DIP Lenders, the Sponsors, the DIP Agent, the Prepetition Administrative Agent, the Prepetition Lenders, or the Consenting Hedge Provider to first deliver a copy of its invoice as provided for herein.

(b)    The Debtors shall be jointly and severally obligated to pay all fees and expenses described above, which obligations shall constitute part of the DIP Obligations.  The Debtors shall pay the reasonable and documented professional fees, expenses, and disbursements of professionals to the extent provided for in Paragraphs 3(d)(3) and 8(c) of this Interim Order (collectively, the "DIP Secured Parties Professionals" and each a "DIP Secured Party Professional") no later than five (5) business days (the "Review Period") after the receipt by counsel for the Debtors, any Committee (if appointed), or the U.S. Trustee of each of the invoices therefor (the "Invoiced Fees") and without the necessity of filing formal fee applications or complying with the U.S. Trustee Guidelines, including such amounts arising before the Petition Date.  Invoiced Fees shall be in the form of an invoice summary for professional fees and categorized expenses incurred during the pendency of the Cases, and such invoice summary shall not be required to contain time entries, but shall include a general, brief description of the nature of the matters for which services were performed, and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any work product doctrine, privilege or protection, common interest doctrine privilege or protection, any

other evidentiary privilege or protection recognized under applicable law, or any other confidential

information, and the provision of such invoices shall not constitute any waiver of the attorney-

client privilege, work product doctrine, privilege or protection, common interest doctrine privilege

or protection, or any other evidentiary privilege or protection recognized under applicable law;

provided that, upon the request of the U.S. Trustee prior to the expiration of the Review Period,

the applicable DIP Secured Party Professional shall provide more detailed support of the Invoiced

Fees to the U.S. Trustee on a confidential basis. The Debtors, any Committee, or the U.S. Trustees

may dispute the payment of any portion of the Invoiced Fees (the "Disputed Invoiced Fees") if,

within the Review Period, a Debtor, any Committee that may be appointed in these Cases, or the

U.S. Trustee notifies the submitting party in writing setting forth the specific objections to the

Disputed Invoiced Fees (to be followed by the filing with the Bankruptcy Court, if necessary, of a

motion or other pleading, with at least ten (10) days prior written notice to the submitting party of

any hearing on such motion or other pleading). For avoidance of doubt, the Debtors shall promptly

pay in full all Invoiced Fees other than the Disputed Invoiced Fees.

(c)     In addition, the Debtors will indemnify the DIP Lenders, the Sponsors, the

DIP Agent, and their respective affiliates, successors, and assigns and the officers, directors,

employees, agents, attorneys, advisors, controlling persons, and members of each of the foregoing

(each an "Indemnified Person") and hold them harmless from and against all costs, expenses

(including but not limited to reasonable and documented legal fees and expenses), and liabilities

arising out of or relating to the transactions contemplated hereby and any actual or proposed use

of the proceeds of any loans made under the DIP Facility; provided that no such person will be

indemnified for costs, expenses, or liabilities to the extent determined by a final, non-appealable

judgment of a court of competent jurisdiction to have been incurred solely by reason of the gross

41

negligence, actual fraud, or willful misconduct of such person (or their related persons). No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's gross negligence, actual fraud, or willful misconduct or breach of their obligations under the DIP Facility, and in no event shall any Indemnified Person be liable on any theory of liability for any special, indirect, consequential, or punitive damages.

19.    No Third Party Rights.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

20.    Section 507(b) Reservation.  Subject to the Carve Out, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Cases.  Nothing contained herein shall be deemed a finding by the Bankruptcy Court, or an acknowledgment by any of the Prepetition Secured Parties that the adequate protection granted herein does in fact adequately protect any of the Prepetition Secured Parties against any Diminution in Value of their respective interests in the Prepetition Collateral (including the Cash Collateral).

21.    Insurance.  Until the DIP Obligations have been indefeasibly paid in full, at all times the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and the DIP Collateral on substantially the same basis as maintained prior to the Petition Date.

22.     <u>No Waiver for Failure to Seek Relief</u>.  The failure or delay of the DIP Agent, the

Required DIP Lenders, or the Sponsors to exercise rights and remedies under this Interim Order,

the DIP Documents, or applicable law, as the case may be, shall not constitute a waiver of their

respective rights hereunder, thereunder, or otherwise.

23.     <u>Perfection of the DIP Liens and Adequate Protection Liens</u>.

(a)     The DIP Agent and the Prepetition Administrative Agent are hereby

authorized, but not required, to file or record financing statements, intellectual property filings,

mortgages, depository account control agreements, notices of lien, or similar instruments in any

jurisdiction in order to validate and perfect the liens and security interests granted hereunder.

Whether or not the DIP Agent or the Prepetition Administrative Agent shall (at the direction of the

applicable required lenders, or solely with respect to the DIP Facility, the Required DIP Lenders)

choose to file such financing statements, intellectual property filings, mortgages, notices of lien,

or similar instruments, such liens and security interests shall be deemed valid, perfected, allowed,

enforceable, non-avoidable, and not, subject to the Challenge Period, subject to challenge, dispute,

or subordination as of the date of entry of this Interim Order.  If the DIP Agent or the Prepetition

Administrative Agent (at the direction of the applicable required lenders, or solely with respect to

the DIP Facility, the Required DIP Lenders) determines to file or execute any financing statements,

agreements, notice of liens, or similar instruments, the Debtors shall cooperate and assist in any

such execution and/or filings as reasonably requested by the DIP Agent or the Prepetition

Administrative Agent (at the direction of the applicable required lenders, or solely with respect to

the DIP Facility, the Required DIP Lenders), and the automatic stay shall be modified to allow such filings.

(b)    A certified copy of this Interim Order may, at the direction of the applicable Required DIP Lenders or the Sponsors, be filed with or recorded in filing or recording offices by the DIP Agent or the Prepetition Administrative Agent in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording; provided, however, that notwithstanding the date of any such filing, the date of such perfection shall be the date of this Interim Order.

(c)    Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code, subject to applicable law.  Any such provision shall have no force and effect with respect to the granting of the DIP Liens and the Adequate Protection Liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor in accordance with the terms of the DIP Credit Agreement or this Interim Order, subject to applicable law.

24.    Release.  Subject to the rights and limitations set forth in Paragraph 12 of this Interim Order, and with respect to the DIP Secured Parties (and solely in their capacity as such) effective upon entry of this Interim Order and, with respect to the Prepetition Secured Parties, upon entry of the Final Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns, shall, to the maximum extent

permitted by applicable law, unconditionally, irrevocably, and fully forever release, remise, acquit,

relinquish, irrevocably waive, and discharge each of the DIP Secured Parties, and the Prepetition

Secured Parties, and each of their respective affiliates, former, current, or future officers,

employees, directors, agents, representatives, owners, members, partners, financial advisors, legal

advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, and

predecessors in interest, each in their capacity as such, of and from any and all claims, demands,

liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations,

rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries,

attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted,

unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened,

including, without limitation, all legal and equitable theories of recovery, arising under common

law, statute, or regulation or by contract, of every nature and description that exist on the date

hereof with respect to or relating to the DIP Obligations, the DIP Liens, the DIP Documents, the

Prepetition Obligations, the Prepetition Liens or the Prepetition Loan Documents, as applicable,

including, without limitation, (i) any so-called "lender liability" or equitable subordination claims

or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and

(iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability,

perfection, or avoidability of the liens or claims of the DIP Secured Parties and the Prepetition

Secured Parties; provided that nothing in this paragraph shall in any way limit or release the

obligations of any DIP Secured Party under the DIP Documents.

25.    Credit Bidding.  The DIP Agent (at the direction of the Required DIP Lenders with

respect to the Lender DIP Loans and the DIP Roll Up Loans, or the Sponsors with respect to the

Sponsor DIP Loans, in each case pursuant to and in accordance with the DIP Credit Agreement)

and the Prepetition Administrative Agent (at the direction of the required lenders as set forth in the Prepetition Credit Agreement) shall have the right to credit bid (either directly or through one or more acquisition vehicles), up to the full amount of the underlying lenders' respective claims, including, for the avoidance of doubt, Adequate Protection Superpriority Claims, if any, in any sale of all or any portion of the Prepetition Collateral or the DIP Collateral, including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any chapter 11 plan subject to confirmation under Bankruptcy Code sections 1129(b)(2)(A)(ii)-(iii).

26.    <u>Bankruptcy Rules</u>. The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

27.    <u>Preservation of Rights Granted Under this Interim Order</u>.

(a)    Unless and until all DIP Obligations are indefeasibly paid in full in cash and all commitments to extend credit under the DIP Facility are terminated, the Prepetition Secured Parties shall:  (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Loan Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against such DIP Collateral; and (ii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral, except as set forth in Paragraph 23 herein.

(b)    In the event this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, any liens or claims granted to the DIP Secured Parties or the Prepetition Secured Parties hereunder arising prior to the effective date of any such vacatur, reversal, or modification of this Interim Order shall be governed in all respects by the original

46

provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein, and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges, and benefits afforded in section 364(e) of the Bankruptcy Code.

(c)    Unless and until all DIP Obligations, Prepetition Obligations, and Adequate Protection Payments are indefeasibly paid in full in cash and all commitments to extend credit under the DIP Facility are terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly (i) except as permitted under the DIP Documents or, if not provided for therein, with the prior written consent of the DIP Agent, the Required DIP Lenders, the Sponsors, and the Prepetition Administrative Agent, (x) any modification, stay, vacatur, or amendment of this Interim Order, (y) a priority claim for any administrative expense or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 503(b), 507(a), or 507(b) of the Bankruptcy Code) in any of the Cases, *pari passu* with or senior to the DIP Superpriority Claims, the Adequate Protection Superpriority Claims, or the Prepetition Obligations, or (z) any other order allowing use of the DIP Collateral; (ii) except as permitted under the DIP Documents (including the Carve Out), any lien on any of the DIP Collateral or the Prepetition Collateral with priority equal or superior to the DIP Liens, the Adequate Protection Liens or the Prepetition Liens, as applicable; (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents and this Interim Order; (iv) except as set forth in the DIP Documents, the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor; (v) an order converting or dismissing any of the Cases; (vi) an order appointing a chapter

11 trustee in any of the Cases; or (vii) an order appointing an examiner with enlarged powers in any of the Cases.

(d)      Notwithstanding any order dismissing any of the Cases entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, and the other administrative claims granted pursuant to this Interim Order, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Payments are indefeasibly paid in full, in cash (and such DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Superpriority Claims, and the other administrative claims granted pursuant to this Interim Order, shall, notwithstanding such dismissal, remain binding on all parties in interest); and (y) to the fullest extent permitted by law, the Bankruptcy Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in clause (x) of this Paragraph 26(d).

(e)      Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, and all other rights and remedies of the DIP Agent, the DIP Lenders, the Sponsors, and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall survive, and shall not be modified, impaired, or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases or by any other act or omission, (ii) the entry of an order approving the sale of any Prepetition Collateral or DIP Collateral pursuant to section 363(b) of the Bankruptcy Code, or (iii) the entry of an order confirming a chapter 11 plan in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors having

48

waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations. The terms and provisions of this Interim Order and the DIP Documents shall continue in these Cases, in any successor cases if these Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code.  The DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, and all other rights and remedies of the DIP Secured Parties and the Prepetition Secured Parties granted by the provisions of this Interim Order shall continue in full force and effect until the DIP Obligations and the Adequate Protection Payments are indefeasibly paid in full, in cash (or, with respect to the DIP Obligations, otherwise satisfied in a manner agreed to by the Required DIP Lenders, the Sponsors, and the DIP Agent).

(f)    Other than as set forth in this Interim Order, neither the DIP Liens nor the Adequate Protection Liens shall be made subject to or *pari passu* with any lien or security interest granted in any of the Cases or arising after the Petition Date, and neither the DIP Liens nor the Adequate Protection Liens shall be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

28.    <u>Limitation on Use of DIP Facility Proceeds, DIP Collateral, and Cash Collateral</u>. Notwithstanding anything to the contrary set forth in this Interim Order, none of the DIP Facility, the DIP Collateral, the Prepetition Collateral (including Cash Collateral), or the Carve Out or proceeds thereof may be used:  (a) to investigate (including by way of examinations or discovery proceedings), initiate, assert, prosecute, join, commence, support, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other litigation of any type (i) against any of the DIP Secured Parties or the Prepetition Secured Parties (each in their capacities as such), or each of their

respective affiliates, officers, directors, employees, agents, representatives, attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, any so-called "lender liability" claims and causes of action, or to seek relief that would impair the rights and remedies of the DIP Secured Parties or the Prepetition Secured Parties (each in their capacities as such) under the DIP Documents, the Prepetition Loan Documents, or this Interim Order, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or any Committee appointed in these Cases in connection with the assertion of or joinder in any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of any of the DIP Secured Parties or the Prepetition Secured Parties to recover on the DIP Collateral or the Prepetition Collateral or seeking affirmative relief against any of the DIP Secured Parties or the Prepetition Parties related to the DIP Obligations or the Prepetition Obligations; (ii) to invalidate, set aside, avoid, or subordinate, in whole or in part, the DIP Obligations or the Prepetition Obligations, or the DIP Agent's, the DIP Lenders', the Sponsors', and/or the Prepetition Secured Parties' liens or security interests in the DIP Collateral or Prepetition Collateral, as applicable; or (iii) for monetary, injunctive, or other affirmative relief against the DIP Secured Parties or the Prepetition Secured Parties, or the DIP Agent's, the DIP Lenders', the Sponsors', or the Prepetition Secured Parties' respective liens on or security interests in the DIP Collateral or the Prepetition Collateral that would impair the ability of any of the DIP Secured Parties or the Prepetition Secured Parties, as applicable, to assert or enforce any lien, claim, right, or security interest or to realize or

recover on the DIP Obligations or the Prepetition Obligations, to the extent applicable; (b) to object

to or challenge in any way the legality, validity, priority, perfection, or enforceability of the claims,

liens, or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition

Secured Parties related to the Prepetition Obligations, or by or on behalf of the DIP Agent, the DIP

Lenders or the Sponsors related to the DIP Obligations; (c) to assert, commence, or prosecute any

claims or causes of action whatsoever, including, without limitation, any Avoidance Actions (as

defined herein) related to the DIP Obligations, the DIP Liens, the Prepetition Obligations, or the

Prepetition Liens; or (d) to prosecute an objection to, contest in any manner, or raise any defenses

to, the validity, extent, amount, perfection, priority, or enforceability of:  (x) any of the DIP Liens

or any other rights or interests of the DIP Agent, the DIP Lenders, or the Sponsors related to the

DIP Obligations or the DIP Liens, or (y) any of the Prepetition Liens or any other rights or interests

of any of the Prepetition Secured Parties related to the Prepetition Obligations or the Prepetition

Liens, provided that no more than $50,000 of the proceeds of the DIP Facility, the DIP Collateral,

or the Prepetition Collateral, including the Cash Collateral, in the aggregate, may be used by any

Committee appointed in these Cases solely to investigate, within the Challenge Period, the claims,

causes of action, adversary proceedings, or other litigation against the Prepetition Secured Parties

solely concerning the legality, validity, priority, perfection, enforceability or extent of the claims,

liens, or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition

Secured Parties related to the Prepetition Obligations.  Nothing contained in this Paragraph 28

shall prohibit the Debtors from responding or objecting to or complying with discovery requests

of any Committee, in whatever form, made in connection with such investigation or the payment

from the DIP Collateral (including Cash Collateral) of professional fees related thereto or from

contesting or challenging whether a Termination Declaration has in fact occurred.

51

29.     <u>Conditions Precedent</u>.  No DIP Lender or Sponsor shall have any obligation to make any DIP Loan under the respective DIP Documents unless all of the conditions precedent to the making of such extensions of credit under the applicable DIP Documents have been satisfied in full or waived in accordance with such DIP Documents.

30.     <u>Binding Effect; Successors and Assigns</u>.  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Cases, including without limitation, the DIP Secured Parties, the Prepetition Secured Parties, the Committee (if any), and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Secured Parties and the applicable Prepetition Secured Parties; <u>provided</u> that, except to the extent expressly set forth in this Interim Order, the Prepetition Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

31.     <u>Limitation of Liability</u>.  In determining to make any loan under the DIP Documents, permitting the use of Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the DIP Secured Parties and the Prepetition Secured Parties shall not, solely by reason thereof, (a) be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§

9601 et seq. as amended, or any similar federal or state statute), or (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.  Furthermore, nothing in this Interim Order or in the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, the Sponsors or any Prepetition Secured Parties of any liability for any claims arising from the prepetition or post-petition activities of any of the Debtors.

32.    No Requirement to File Claim for DIP Obligations.  Notwithstanding anything to the contrary contained in any prior or subsequent order of the Bankruptcy Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, none of the DIP Agent, the DIP Lenders or the Sponsors shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the DIP Obligations, all of which shall be due and payable in accordance with the DIP Documents without the necessity of filing any such proof of claim or request for payment of administrative expenses, and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the DIP Documents or of any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the DIP Agent's, the Sponsors', or any DIP Lender's rights, remedies, powers, or privileges under any of the DIP Documents, this Interim Order, or applicable law.  The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

33.    No Requirement to File Claim for Prepetition Obligations.  Provided that the Plan is confirmed and consummated, then notwithstanding anything to the contrary contained in any

prior or subsequent order of the Bankruptcy Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, neither the Prepetition Administrative Agent nor any Prepetition Lender shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the Prepetition Obligations, and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the Prepetition Loan Documents or of any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the Prepetition Administrative Agent's or any Prepetition Lender's rights, remedies, powers, or privileges under any of the Prepetition Loan Documents, this Interim Order, or applicable law.  Notwithstanding anything to the contrary contained in this Paragraph 32, if the Plan is not confirmed or does not become effective, then this Paragraph 32 shall not relieve the Prepetition Administrative Agent or any Prepetition Lender from filing a proof of claim, provided that nothing herein shall prevent the Prepetition Administrative Agent or any Prepetition Lender from entering into a stipulation approved by the Bankruptcy Court that would relieve the Prepetition Administrative Agent or any Prepetition Lender from any obligation to file any proof of claim described in this Paragraph 32.  The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

34.     No Marshaling.  Subject to entry of a Final Order, the DIP Agent and the DIP Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, and proceeds of the DIP Collateral shall be received and applied pursuant to this Interim Order and the DIP Documents notwithstanding any

other agreement or provision to the contrary.  Subject to entry of a Final Order, the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral.

35.   <u>Application of Proceeds of DIP Collateral</u>.  Subject to entry of a Final Order, the DIP Obligations, at the option of the Required DIP Lenders and the Sponsors, to be exercised in their sole and absolute discretion, shall be repaid (a) first, from the DIP Collateral comprising Previously Unencumbered Property and (b) second, from all other DIP Collateral.

36.   <u>Equities of the Case</u>.  The Prepetition Secured Parties shall each be entitled to all the rights and benefits of section 522(b) of the Bankruptcy Code, and, subject to and upon entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, product, offspring, or profits of any of the Collateral (including the Prepetition Collateral).

37.   Notwithstanding anything herein to the contrary, the exercise of any right or remedy relating to any failure to comply with the Milestones (as defined in the DIP Credit Agreement) shall be subject to the entry of a Final Order, except with respect to any failure to comply with the Milestones that occurs prior to the date of entry of a Final Order.

38.   <u>Final Hearing</u>.  The Final Hearing on the Motion shall be held on [•], 2020, at__:__ _.m., prevailing Eastern Time.  Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on _____, 2020, and shall be served on:   (a) the Debtors, Lakeland Tours, LLC, 218 Water Street West, Suite 400, Charlottesville, VA 22902, Attn:  Bob Gogel; (b) proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Nicole L. Greenblatt, P.C., and Neda Davanipour, and Kirkland & Ellis, 300 North LaSalle Street, Chicago, Illinois 60654,

Attn:  Whitney Fogelberg; (c) counsel to the DIP Lenders and the Prepetition Lenders, Gibson,

Dunn & Crutcher LLP, 200 Park Ave., New York, NY 10166, Attn:  Scott J. Greenberg, Esq.,

Steven A. Domanowski, Esq., and Jeremy D. Evans; (d) counsel to the DIP Agent, Latham &

Watkins, LLP, 885 Third Avenue, New York, New York 10022, Attn: Victor V. Ludwig and Hugh

Murtagh; (e) counsel to the Sponsors, each of (i) Cravath, Swaine & Moore LLP, 825 Eighth

Avenue, New York, New York 10019, Attn:  Paul H. Zumbro and George E. Zobitz and (ii)

Simpson Thatcher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017, Attn:

Michael H. Torkin; (f) the United States Trustee, U.S. Federal Office Building, 201 Varick Street,

Suite 1006, New York, New York 10014, Attn: Benjamin J. Higgins; and (g) counsel to any

statutory committee appointed in these Cases.  In the event no objections to entry of the Final

Order on the Motion are timely received, this Bankruptcy Court may enter such Final Order

without need for the Final Hearing.

39.     Effect of this Interim Order.  This Interim Order shall constitute findings of fact

and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable

immediately upon execution hereof.

40.     Retention of Jurisdiction.  The Bankruptcy Court retains exclusive jurisdiction with

respect to all matters arising from or related to the implementation of this Interim Order.

Dated: _____, 2020
New York, New York                          _____
                                            UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT 1

**Approved Budget**

## Short Term Cash Flow Forecast – 13-Week Budget

| $000s / Week Ending | Week 1 Jul 24 | Week 2 Jul 31 | Week 3 Aug 7 | Week 4 Aug 14 | Week 5 Aug 21 | Week 6 Aug 28 | Week 7 Sep 4 | Week 8 Sep 11 | Week 9 Sep 18 | Week 10 Sep 25 | Week 11 Oct 2 | Week 12 Oct 9 | Week 13 Oct 16 | Week 1-13 7/24 - 10/16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | 180,283 | 238,708 | 212,743 | 194,871 | 174,600 | 176,368 | 168,087 | 160,000 | 160,000 | 109,767 | 94,744 | 86,608 | 84,377 | 180,283 |
| Operating Receipts | 1,751 | 1,751 | 4,369 | 1,869 | 52,369 | 1,869 | 2,775 | 2,775 | 2,775 | 2,775 | 3,825 | 3,825 | 3,825 | 86,550 |
| Operating Disbursements | (15,005) | (25,714) | (22,141) | (22,141) | (25,560) | (21,141) | (24,010) | (19,692) | (24,113) | (17,738) | (12,059) | (5,957) | (9,226) | (244,737) |
| Cash Flow from Operations | (13,256) | (23,963) | (17,772) | (20,272) | 26,780 | (19,272) | (21,216) | (16,923) | (21,344) | (16,013) | (8,236) | (2,132) | (6,401) | (158,187) |
| Inflows (Outflows) Restructuring Related: | | | | | | | | | | | | | | |
| Rating Agencies | - | - | - | - | (750) | - | - | - | - | - | - | - | - | (750) |
| DIP Proceeds / (DIP Repayment) | 150,000 | - | - | - | (25,000) | - | 15,443 | 16,923 | 17,629 | - | - | - | - | 175,660 |
| DIP Interest | - | - | - | - | - | - | - | - | (5,217) | - | - | - | - | (5,217) |
| Adequate Protection | - | - | - | - | - | - | - | - | (4,640) | - | - | - | - | (4,640) |
| Utility Deposit | (200) | - | - | - | - | - | - | - | - | - | - | - | - | (200) |
| US Trustee Quarterly Fee | - | - | - | - | - | - | - | - | (750) | - | - | - | - | (750) |
| Chapter 11 Filing Fee | (43) | - | - | - | - | - | - | - | - | - | - | - | - | (43) |
| Restructuring Charges | - | - | (300) | - | - | - | (380) | - | (25,920) | - | - | - | - | (26,600) |
| Net Change in Cash | 138,422 | (23,963) | (18,072) | (20,272) | 969 | (19,272) | (8,087) | (0) | (40,243) | (16,013) | (8,236) | (2,132) | (6,401) | (21,007) |
| Ending Unrestricted Book Cash Balance | 238,708 | 212,743 | 194,871 | 174,600 | 176,368 | 168,087 | 160,000 | 160,000 | 109,767 | 94,744 | 86,608 | 84,377 | 78,976 | 78,976 |
| Restricted Cash | 21,392 | 21,392 | 18,892 | 18,892 | 18,892 | 18,892 | 18,892 | 18,892 | 18,892 | 18,892 | 18,892 | 18,892 | 18,892 | 18,892 |

## **EXHIBIT 2**

**DIP Credit Agreement**

[To be filed in advance of hearing]

# **EXHIBIT B**

## **Spencer Declaration**

Nicole L. Greenblatt, P.C.
Susan D. Golden
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Whitney Fogelberg (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LAKELAND TOURS, LLC, *et al.*,[1] | ) | Case No. 20-11647 (JLG) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF**
**STEPHEN SPENCER IN SUPPORT**
**OF THE DEBTORS' MOTION SEEKING ENTRY OF**
**INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS**
**(A) TO OBTAIN POSTPETITION FINANCING AND (B) TO UTILIZE**
**CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO**
**PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY,**
**(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

I, Stephen Spencer, make this Declaration pursuant to 28 U.S.C. § 1746:

1.      I submit this declaration (this "<u>Declaration</u>")[2] in support of the motion of the above

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Lakeland Tours, LLC (2946); Brightspark Travel, Inc. (4913); Explorica Merida Holdings, LLC (6915); Explorica Travel, Inc. (4040); Explorica, Inc. (3247); GlobaLinks - Canada, LLC (0811); GlobaLinks, LLC (6865); Heritage Education & Festivals, LLC (6352); International Studies Abroad, LLC (4025); ISA World Holding, LLC (5258); Lakeland Finance, LLC (9273); Lakeland Holdings, LLC (2612); Lakeland Seller Finance, LLC (0866); Leadership Platform Acquisition Corporation (4276); National Educational Travel Council, LLC (5704); Oxbridge Academic Resources, LLC (6010); Travel Turf, Inc. (0766); WH Blocker, Inc. (5344); WorldStrides Holdings, LLC (5007); WorldStrides International, LLC (6303); WS Holdings Acquisition, Inc. (9485); WS Holdings, Inc. (0057); WS Purchaser, Inc. (0370).  The location of the Debtors' service address in these chapter 11 cases is: 49 West 45th Street, New York, NY 10036.

[2]    Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the First Day Declaration, the DIP Motion, the DIP Credit Agreement, or the Interim Order (as defined below), as applicable.

captioned debtors and debtors in possession (collectively, the "Debtors") for authority to obtain postpetition debtor in possession financing and use cash collateral (the "DIP Motion").   In particular, I submit this Declaration in support of my view that the proposed debtor-in-possession credit facility (the "DIP Facility") is (a) the product of an arm's-length, good-faith negotiation process, (b) the best available postpetition financing option for the Debtors, and (c) contains reasonable terms and conditions under the circumstances.

2.       The statements in this Declaration are, except where specifically noted, based on my personal knowledge or opinion, on information that I have from the Debtors' advisors or employees working directly with me or from other members of the Houlihan Lokey Capital, Inc. ("Houlihan") team working under my supervision or direction, or from the Debtors' books and records.  Specifically, I have overseen a Houlihan team which, since March 31, 2020, has been one of the principal advisors for the Debtors, and I have been directly involved in that capacity in the matters leading up the Debtors' chapter 11 filings.  I am not compensated specifically for this testimony.  The compensation Houlihan receives as a professional whose retention the Debtors seek to obtain this Bankruptcy Court's approval of pursuant to an application to be filed with this Bankruptcy Court, at a later date, does factor into my compensation as an employee of Houlihan. I am over the age of 18 years and I am authorized to submit this Declaration on behalf of the Debtors.  If I were called upon to testify, I could and would competently testify to the facts set forth herein.

### Background and Qualifications

3.       I am a Managing Director in the Financial Restructuring Group of the firm Houlihan.  I have a broad range of experience in financial advisory assignments, including extensive experience with chapter 11 restructurings.  During the course of my career, I have advised companies and creditor groups in connection with raising capital in the bankruptcy

context, including assisting chapter 11 debtors in obtaining and negotiating the terms of debtor-in-possession and exit financing loans. I also have extensive experience representing companies, creditors, and other constituencies in transactions involving the sale of all or substantially all of a company's assets. Additionally, I have performed numerous enterprise valuations in the bankruptcy context. I have submitted declarations and provided expert testimony related to those matters in a number of chapter 11 cases.

4.      I have been employed by Houlihan for the past 19 years. Before joining Houlihan, I began my career in financial restructuring underwriting and syndicating commercial and debtor in possession loans at GE Capital. I have over 25 years of experience advising companies and creditors in complex financial restructuring, liability management, and distressed mergers and acquisitions. My experience spans a diverse array of industries, including travel, infrastructure, aerospace and defense, transportation and logistics, agriculture, energy, consumer products, retail, and media. I received a bachelor's degree from the University of Wisconsin and a master's degree from Fordham University.

5.      Houlihan is a financial advisory and investment banking firm with its principal office located at 10250 Constellation Boulevard, Los Angeles, CA 90067. Houlihan is a registered broker-dealer with the United States Securities and Exchange Commission and is a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation. Established in 1972, Houlihan, together with its subsidiaries, has approximately 1,300 employees located in 24 offices worldwide. Houlihan has one of the largest worldwide financial restructuring practices of any investment bank. Houlihan's Financial Restructuring Group, which has approximately 200 professionals, is one of the leading advisors and investment bankers to debtors, secured and unsecured creditors, acquirers, and other parties-in-interest involved in financially

troubled companies both in and outside of bankruptcy.  Houlihan has served more than 1,000 clients annually over the past several years, ranging from closely held companies to Global 500 corporations.

6.      I am the designated project leader from Houlihan with respect to the Debtors and have been performing a wide variety of advisory services for the Debtors since March 2020.  In this capacity, I am familiar with the Debtors' business and financial affairs, and I offer this Declaration in support of the DIP Motion.

### Houlihan Engagement and Preliminary Financing Needs Assessment

7.      Houlihan was engaged by the Debtors on March 31, 2020.  At the time of Houlihan's engagement, the Debtors were navigating through the beginning stages of the COVID-19 crisis, which has had a materially negative impact on the Debtors' business.  The Debtors, who provide a wide range of educational travel experiences, faced an unprecedented number of trip cancellations, and the likelihood of travel recovering in May or June was diminishing with each passing day.  As the Debtors typically generate over two-thirds of their revenue in March, April, May, and June, the COVID-19 pandemic quickly emerged as a major external threat to the Debtors' business.  The Debtors' working capital cycle further exacerbated the impact of the COVID-19 pandemic.  Specifically, because the Debtors generally begin receiving customer payments 12 to 18 months prior to any arranged travel, the Debtors had a high cash balance immediately prior to the COVID-19 outbreak.  As the pandemic worsened, the Debtors were placed in a difficult position as they were forced to halt the vast majority of their scheduled trips.  The cancellation of such trips provoked widespread customer demands for refunds.

8.       On or about this time, the Debtors engaged Houlihan to, among other things, analyze and quantify the liquidity impact of meeting its customer refund commitments in a period of significantly diminished revenue.  Assessing the financial impact of COVID-19 on the Debtors' operations, including refund obligations, required an extensive analysis of the market backdrop, potential operational cost savings opportunities, impact on business and customer relations, and anticipated future cash inflows.

9.       Working closely with the Debtors' management team, and based on legal advice the company received, Houlihan determined that the Debtors had an estimated $200 million liquidity need.  Based on analyses supported by Houlihan, an incremental $200 million would provide the Debtors with a liquidity cushion adequate to ensure survival through the fourth quarter of 2021, at which time the Debtors are projected to return to a normalized operating environment and receive monthly cash inflows commensurate with historical levels.  Factored into the Debtors' liquidity requirement are a range of operating cost reductions to help bolster their liquidity position.  Specifically, the Debtors' contemplated cost savings initiatives included reductions in labor force, employee compensation and benefits, various operating costs, such as marketing, information technology, training, and conference related expenditures, and rent and occupancy expenses.

## The Debtors' Efforts to Obtain Postpetition Financing

10.      Around the same time Houlihan was retained, an ad hoc group of the Debtors' lenders under the Prepetition Credit Agreement (the "Ad Hoc Group") organized and retained Gibson, Dunn & Crutcher LLP as counsel, and Rothschild & Co. as financial advisor.  The Ad Hoc Group proactively reached out to the Debtors to advise them that they had organized and intended to be helpful partners and foster productive engagement on restructuring and forecasting

analyses.  Accordingly, when Houlihan commenced a financing process to secure funding for the Debtors' business operational requirements, Houlihan began extensive interactions with the Debtors' prepetition lenders (the "Prepetition Secured Lenders"), including the Ad Hoc Group, and continued its ongoing communication with the Debtors' equity owners (collectively, the "Sponsors") as potential sources of funding.

11.     On May 13, 2020, the Debtors and Houlihan presented to the Prepetition Secured Lenders a high-level summary of the Debtors' business, financial projections, customer refund plan, and cost reduction strategy.  The majority of the Ad Hoc Group executed non-disclosure agreements with the Debtors just prior to the presentation, and, immediately following the presentation, received several supporting files, which included the impact of COVID-19 to the Debtors' liquidity, growth projections, and the refund schedule.  The information offered a clear depiction of the Debtors' liquidity situation and need to restructure its outstanding debt obligations. Only those that executed the non-disclosure agreement attended the virtual presentation and received this information and, shortly after the presentation, the remaining members of the Ad Hoc group executed the non-disclosure agreement and received the same information package.

12.     Over the next eight weeks, Houlihan engaged with the Ad Hoc Group, the Sponsors, and their respective financial and legal advisors in an effort to develop and negotiate a plan of reorganization to finance the Debtors' projected liquidity needs and service their debt obligations in light of the Debtors' capital structure (approximately $768 million in total debt obligations consisting of approximately (a) $642 million under the senior secured Prepetition Credit Agreement and (b) approximately $126 million in unsecured Seller Notes that are structurally subordinated to all unsecured claims of the Debtors' operating entities).  This process entailed numerous rounds of negotiation.  At an early stage of the negotiating process, the advisors

6

to the Ad Hoc Group formally requested that Houlihan engage on an exclusive basis with the Ad Hoc group to formulate a plan of reorganization and refrain from (a) engaging with the Sponsors and other stakeholders or (b) commencing a broader marketing process to contact potential third party financial and strategic investors.  The Ad Hoc Group expressed an unwillingness to engage in any discussions with parties unsupportive of a full economic recovery to the Prepetition Secured Lenders and maintained a growing concern that a broader solicitation process to potential third party capital providers risked distracting management and further destabilizing the business, with market chatter around the funding need prompting a re-escalation of customer refund demands in lieu of negotiated trip deferrals.

13.     In addition, and during the initial stages of the negotiation, the Sponsors offered an alternative proposal to serve as a stalking horse bidder for the purchase of the company that would have materially impaired the secured lenders.  The Prepetition Secured Lenders were not willing to agree to the Sponsors' proposal, but eventually agreed to permit the Sponsors to participate in a transaction structure proposed by them.  The negotiations that ensued resulted in the development of the proposed prepackaged plan of reorganization (the "Plan") and related DIP Facility to exit financing package, which is the centerpiece of the Debtors' proposed recapitalization and reflects the arm's length, heavily negotiated deal reached among the Ad Hoc Group and the Sponsors to jointly fund the new capital need, with the lender money as senior secured debt and the sponsor money as junior capital at emergence (with both groups funding the DIP Facility on equal priority during the chapter 11 cases).

I.     **Superior Alternative Sources of Financing Are Not Available.**

14.     Before, during, and after the period in which the Ad Hoc Group and the Sponsors entered into a productive dialogue around the Plan, Houlihan explored various alternative financing options.  These financing efforts included a targeted process designed to obtain a secured

7

bridge financing package, collateralized by anticipated proceeds from the Debtors' business interruption insurance policy.

15.     As part of the Debtors' risk mitigation strategy, the business maintains a trip cancellation and gross profit protection policy with a Lloyd's of London syndicate, which specifically includes a rider for communicable disease coverage. The policy maintains three insuring clauses (clauses I, II, and III), and the COVID-19 pandemic triggered a potential claim for all clauses. However, each clause is unique and adheres to an independent claims process. The first claim under the policy was filed in April 2020 (a clause II claim) and the Debtors received their first payment of proceeds in July 2020. This payment comprised a portion of the expected proceeds from clause II, and the Debtors have not yet received proceeds from either clause I or clause III claims. The process for filing and reviewing all claims, and receiving subsequent payments, is ongoing and could last well into calendar year 2021. These policy dynamics prompted Houlihan to explore a financing process that would bridge to the receipt of such proceeds.

16.     As part of this process and to avoid information leakage, Houlihan approached a select number of prospective lenders to gauge market interest and indicative terms. In total, Houlihan reached out to 22 lenders; eight lenders executed non-disclosure agreements and received confidential information, and two parties submitted an indication of interest. The indications received were expensive, with a targeted multiple of investment capital of roughly 1.5x and a twelve-month internal rate of return target of approximately 65%. Given the high cost of capital implied by the proposed terms, Houlihan recommended that the Debtors decline to pursue the insurance bridge financing process further and continue negotiations with the Ad Hoc Group and Sponsors.

17.     In addition to the bridge financing process, Houlihan pursued discussions around potential alternative financing options with individual senior secured investors (both within and outside of the Ad Hoc Group) and new third party investors.  These discussions produced important market feedback with two consistent messages:  (i) none of the potential existing or third party investors were willing to offer the financing to the Debtors with a security interest junior to the current senior secured debt obligations; and (ii) all of these parties viewed the Debtors' prepetition senior secured debt as impaired, with the Debtors' enterprise value below the par value of the senior secured debt amount (*i.e.*, the amount owed to the Prepetition Secured Lenders).

18.     After confidential information that restricted the Ad Hoc Group was released, Houlihan followed up with potential third party investors who previously expressed interest in providing financing to the Debtors; none of these investors expressed interest in providing a competing DIP financing proposal on more favorable economic terms than the proposed DIP Facility.  This third party investor feedback coupled with prior financing efforts validates my belief that no superior sources of financing are currently available to the Debtors.

19.     The lack of competing financing alternatives reflects a variety of company specific and broader market factors including:

a.     The Debtors' challenged financial position:  until the third quarter of calendar year 2021, the Debtors are projected to have limited to no debt service capacity.  During this period, traditional credit metrics will largely be irrelevant, as new investment capital, in the form of the DIP Facility and Priority Exit Facility, will be used to fund cash losses and position the business for an eventual end market recovery.

b.     Broader challenges in the travel sector:  numerous companies in the broader travel sector are experiencing similar financing challenges.  The suddenness and magnitude of the travel decline is unprecedented.  Consequently, DIP financing providers for certain travel related businesses are requiring such financings to provide debtors with a liquidity cushion to fund both bankruptcy and post-emerge operating losses as a way to ensure value recovery for DIP financing providers through franchise value preservation.

c.     The unique nature of the proposed financing:  in essence, the proposed DIP Facility and Priority Exit Facility are cash flow loans without any near-term cash flow

support.  With few hard assets to ensure lender recoveries in a downside scenario, the DIP Lenders have agreed to fund a Priority Exit Facility that sustains the business to a recovery that cannot be guaranteed.  In such a scenario it is understandable that the DIP Lenders are linking the DIP Facility to a Priority Exit Facility as a defensive measure to mitigate business value diminution.

## II.    The DIP Facility Proposal.

20.    Despite the previously indicated challenges, this DIP Facility proposal supports both the liquidity needs of the Debtors in bankruptcy and the eventual recovery of the business. Following extensive arm's-length negotiations, the Debtors, the Prepetition Secured Lenders, and the Sponsors agreed to comprehensive restructuring terms that provided access to new money during the pendency of these chapter 11 cases.  Specifically, these discussions resulted in an agreement between the Debtors and certain of the Prepetition Secured Lenders and Sponsors regarding the terms of a DIP Facility, consisting of: (a) a superpriority senior secured term loan credit facility in the aggregate amount of up to approximately $351.8 million (the "DIP Loans"), comprised of (i) $100 million of new money provided by the DIP Lenders (the "Lender DIP Loans"), (ii) $100 million of new money provided by the Sponsors (the "Sponsor DIP Loans"), (iii) a roll up of $150 million in outstanding Prepetition Loans (as defined below) (the "DIP Roll Up Loans"), and (iv) the roll-over of up to approximately $1.8 million of Existing Letters of Credit; and (b) to secure the Credit Agreement Hedging Obligations (as defined in the RSA) on a postpetition basis.  Moreover, the DIP Lenders providing the Lender DIP Loans agreed that upon confirmation of the Debtors' proposed prepackaged Plan, the Lender DIP Loans and the DIP Roll Up Loans will convert into exit term loans so that the Debtors should not need to solicit additional sources of capital to fund the Debtors' emergence, and the Sponsors agreed that upon such confirmation, the Sponsor DIP Loans will convert into common equity of the reorganized company parent.  Importantly, the Lender DIP Loans are an integral part of the Debtors' RSA and I understand that the Sponsors and all of the proposed DIP Lenders also signed the RSA

10

documenting their support for the Debtors' proposed prepackaged Plan and solidifying support for a value-maximizing restructuring.

21.     The RSA and the DIP Facility were negotiated together and were part of a comprehensive deal. The DIP Facility is tied closely to the exit financing for the business and reflects that there is significant new capital needed to support the Debtors' businesses through this pandemic and limited collateral to support the new money investment. Accordingly, the deal encourages participation in the new money by all existing senior secured lenders to enhance their position in the capital stack (through the roll up), while simultaneously ensuring that senior secured lenders who cannot or will not make an incremental investment in the Debtors receive a fair, albeit significantly impaired, recovery. As a result of the new money "topping" existing secured debt, the senior secured lenders would not tolerate any junior debt remaining on the business or any new capital coming in from the Sponsors in the form of anything other than equity. I believe the DIP to exit financing structure contemplated by the RSA reflects a fair and hard fought compromise among the parties that maximizes the debt capacity of the business and provides the existing stakeholders with the best available forms of recovery consistent with their relative priorities. Moreover, the DIP Facility is necessary to avoid the liquidation of the Debtors, which would result in the loss of approximately 1,500 jobs. Thus, under the circumstances and in the context of the overall restructuring, the Debtors agreed to the fees, rates and other economics of the DIP Facility (as described in detail below) and I believe that such terms are in the best interests of the Debtors and all stakeholders.

22.     The DIP Facility is critical to the Debtors' ability to pay the administrative costs of these chapter 11 cases, and should provide the Debtors with sufficient liquidity to operate their business without creating a "priming" or valuation dispute at the outset of these chapter 11 cases.

In sizing the DIP Facility, the parties to the RSA also spent considerable time and energy analyzing options with respect to the Debtors' refund policies, ultimately determining that continuing to provide certain cash refunds was essential to maintaining and preserving the Debtors' reputation and brand value, thereby maximizing the value-generating capacity of the enterprise and associated recoveries to stakeholders.  The DIP Facility was deliberately sized to ensure adequate liquidity to bridge the Debtors to a return of revenue, taking into account the timing and amount of anticipated customer refunds.  In tandem with the RSA, the Debtors believe that the DIP Facility provides a path to emergence that is important to ensuring a reorganization, rather than the alternative, which would be far worse for all creditors and stakeholders.

### The DIP Facility was Negotiated in Good Faith and at Arm's Length and the Fees in Connection with the DIP Facility are Reasonable and Market

23.    My team and I, along with the Debtors' other advisors, actively negotiated the terms and provisions of the DIP Facility on behalf of the Debtors over approximately the last three months.  The process was rigorous and marked by hard bargaining to achieve the best available terms for the Debtors for what ultimately became the DIP Facility.  During that time, the parties exchanged numerous term sheets and mark-ups in an effort to reach the best available material terms under the circumstances.

24.    The fees and rates to be paid under the proposed DIP Facility were the subject of arm's-length and good faith negotiation between the Debtors, the DIP Lenders, and the Sponsors, are an integral component of the overall terms of the proposed DIP Facility, and were required by the DIP Lenders and Sponsors as consideration for the extension of debtor-in-possession financing, and by the DIP Lenders as consideration for the extension of postpetition financing.  Under the circumstances, I believe that the fees, rates and other economics provided for in the DIP Facility are reasonable.  These fees are summarized below.

| Interest Rate | • L + 1,200 bps payable in cash (subject to 1.25% LIBOR Floor) paid quarterly with respect to the Lender DIP Loans and Sponsor DIP Loans<br><br>• L + 150 bps payable in cash (subject to 1.25% LIBOR Floor) and 1,050 bps PIK paid quarterly with respect to the DIP Roll Up Loans |
|---|---|
| Backstop Fee | • 5.00% Backstop Fee |
| Commitment Fee | • 3.00% Commitment Premium Fee |
| Fronting Premium | • 25 bps  Fronting Premium |

25.     Under the current circumstances, given the lack of any other alternatives, and based on my knowledge of similar financings in the market, I believe that the fees, rates, and other economics provided for in the DIP Facility are reasonable under the circumstances.

26.     The DIP Facility also contains certain milestones that the Debtors must meet throughout their chapter 11 cases.  The milestones were negotiated by the Debtors, the DIP Lenders, and the Sponsors, as a condition to providing the DIP Facility and signing the RSA, and they provide the Debtors with adequate time to implement a value-maximizing process.  The milestones reflect the need to limit the Debtors' time in bankruptcy while ensuring adequate notice and opportunity for all stakeholders to review the Plan.  Accordingly, I believe these milestones are appropriate under the circumstances.

**The DIP Facility is Fair and Reasonable under the Circumstances**

27.     Based on my experience with DIP financing transactions, as well as my involvement in the negotiation of the DIP Facility and pursuit of alternative postpetition financing proposals, I believe that the DIP Facility is the best and only available financing option to the Debtors in the circumstances.  As noted above, the proposed DIP Facility provides the Debtors with access to crucial liquidity at the outset of the chapter 11 cases and facilitates a consensual

prepackaged Plan.  In addition, the DIP Facility will provide the Debtors with access to the use of cash collateral on a consensual basis and should allow the Debtors to fund their business in the ordinary course during the chapter 11 cases.

28.     Finally, and perhaps most importantly, the DIP Facility provides the Debtors with a path towards a successful and expeditious reorganization.  The proposed DIP Facility, together with the RSA and the Plan, should provide the Debtors with an expeditious and adequately capitalized exit from chapter 11 in approximately 30 days, which the Debtors believe will best preserve the value of the Debtors' business and operations.  The DIP Facility is an integral part of the transactions contemplated by the RSA, with the DIP Lenders and Sponsors having also signed the RSA, documenting their support for the Plan.

## Conclusion

29.     In summary, based on my experience with DIP financing transactions, as well as my involvement in the negotiation of the DIP Facility and pursuit of alternative postpetition financing proposals, I believe, that the terms of the DIP Facility are reasonable under the circumstances and were the product of good faith, arm's-length negotiations.

[*Remainder of page intentionally left blank*]

14

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

July 22, 2020
New York, New York

By:
*/s/ Stephen Spencer*
Stephen Spencer
Houlihan Lokey Capital, Inc.